**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 6 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CONRADO COTA-HERRERA,

    Defendant-Appellant.

No. 02-1556
(No. 02-CR-90-M)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

Convicted of illegal reentry following a prior deportation for an aggravated felony in violation of 8 U.S.C. § 1326(a), Conrado Cota-Herrera appeals the district court's denial of his motions to suppress evidence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*] The case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# I

On the morning of January 24, 2002, on an interstate highway in the city of Fruita, Colorado, State Trooper Oreolt observed a white van drifting into the shoulder. Judging from the compression on the rear suspension, Oreolt noted that the van was likely carrying large quantities of cargo or passengers. After the van failed to timely signal as it turned off the highway, Oreolt followed the van off the exit and into the parking lot of a fast-food restaurant. Between the freeway exit and the parking lot, the van committed another traffic violation when it drove straight through a right-hand turn lane.

As he walked toward the van in the parking lot, Oreolt noticed that the vehicle had California license plates and tinted windows, and that many passengers were crowded in the back. In English and broken Spanish, he communicated to the driver, Cota-Herrera, the reason for the stop. When Oreolt requested Cota-Herrera's driver's license, registration, and insurance, he saw that there were approximately fifteen passengers of Mexican or Central American descent in the van, but could not detect any luggage or clothing. Cota-Herrera was unable to produce proof of insurance, but he provided the officer with a driver's license and the vehicle registration; the name on the registration did not match the name on the license. Cota-Herrera explained that the owner of the van was not present, but that he had permission to drive it. Oreolt then asked Cota-

Herrera, in English and then in Spanish, whether all of the passengers were properly documented, at which point Cota-Herrera's English-language skills faltered. Based on the large number of passengers, their tired appearance, their failure to provide documentation, the absence of luggage, and a smell emanating from the van that he associated with long journeys, Oreolt contacted the Immigration and Naturalization Service ("INS") reporting a possible alien-smuggling load. While waiting, Oreolt retained Cota-Herrera's driver's license and registration. In addition to his suspicions regarding the immigration status of the occupants, Oreolt testified that he had a secondary reason for detaining the vehicle—for lack of insurance and proof of lawful possession of the van.

When INS agents White and Cooper arrived fifteen to twenty minutes later, Oreolt handed over the driver's license and registration to the agents and issued a verbal warning to Cota-Herrera for the traffic violations. White, with his INS badge displayed and a firearm at his waist, approached the vehicle. After briefly speaking with Cota-Herrera, White proceeded to open the sliding door of the van, and noticed between twelve and fifteen passengers cramped, without seat belts, inside. In accordance with standard INS procedure, White identified himself as an immigration agent and asked the passengers in Spanish whether they were in the United States illegally. He received affirmative responses from some of the passengers, and no negative responses. Based on these responses, Agent White

moved the entire group, including Cota-Herrera, into INS vans and transported them to the INS facility for further investigation.

Once the group was in administrative custody at the INS office, the INS collected the group's property for tagging, at which time Cota-Herrera identified himself to officials with a different name. Before being advised of their rights or being placed under arrest, each individual in the group was asked a series of routine biographical questions from a "213" form. (2 R. at 57.) This form is completed for all aliens in administrative custody and is used to initiate deportation and removal proceedings. As part of this inquiry, INS agents asked Cota-Herrera when, where, and how he entered the United States. Everyone in the group was then processed through a fingerprint-identification system, which identified the driver's name as Cota-Herrera. Upon identifying him, the INS read Cota-Herrera his rights under Miranda v. Arizona, 382 U.S. 436 (1966), after which time Cota-Herrera refused to answer any further questions. INS officials ordered Cota-Herrera's "A-file," received a few days later, which revealed that he had previously been deported. (3 R. at 27.)

On February 25, 2002, Cota-Herrera was indicted for illegally reentering the United States after previously being deported pursuant to a felony conviction, in violation of 8 U.S.C. § 1326(a). He filed two motions to suppress evidence resulting from the allegedly unlawful detention of the van and its passengers and

- 4 -

the statements he made prior to being informed of his <u>Miranda</u> rights. Rejecting both motions on June 24, 2002, the district court found that the detention was permissible under the Fourth Amendment, and that the motion to suppress Cota-Herrera's statements was moot because the government did not intend to submit the statements at trial. Subsequently, Cota-Herrera filed a third motion to suppress, again arguing that his statements to law-enforcement officers were obtained in violation of <u>Miranda</u>, which was also denied. Following a jury trial, Cota-Herrera was convicted of illegal reentry after deportation, and sentenced to sixty-three months' imprisonment. We consider Cota-Herrera's direct appeal from the denial of his suppression motions.

## II

In reviewing the denial of a motion to suppress, "we accept the district court's factual findings unless clearly erroneous, and view the evidence in the light most favorable to the government. However, we review <u>de novo</u> the ultimate determination of the reasonableness of the search under the Fourth Amendment." <u>United States v. Bustillos-Munoz</u>, 235 F.3d 505, 511 (10th Cir. 2000) (quotation omitted). In claiming a violation of his Fourth Amendment rights, Cota-Herrera challenges both (1) Trooper Oreolt's initial detention of the van and its passengers, and (2) the INS's detention of the group.

As to Oreolt's detention of the van and its passengers, Cota-Herrera does not challenge the legality of the initial traffic stop. Rather, he claims that his continued detention after he provided a license and registration was unjustified under the Fourth Amendment. "We have consistently applied the principles of Terry v. Ohio, 392 U.S. 1 (1968), to routine traffic stops." United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001). During a routine traffic stop, the officer is entitled to request a driver's license and registration, but "once the motorist has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." Id. at 1221. "Further delay is justified only if the officer has reasonable suspicion of illegal activity or if the encounter has become consensual." Id.

In the instant case, Cota-Herrera provided Oreolt with his driver's license and the vehicle registration, but was neither able to prove that he was entitled to operate the van, as the owner identified on the registration was not present, nor able to produce proof of insurance. These facts alone created reasonable suspicion for Oreolt to detain the van and the driver, notwithstanding Oreolt's testimony that these were not the sole reasons for the detention. See United States v. Galindo-Gonzales, 142 F.3d 1217, 1224 (10th Cir. 1998) (holding that driver's failure to provide proof of lawful possession of the vehicle creates

reasonable suspicion that the car may have been stolen, even though the officer "did not characterize his questioning about the passengers as part of an investigation of a possible car theft"). The existence of reasonable suspicion is particularly apparent when evaluating the lack of insurance and proof of lawful possession in conjunction with the other facts observed by Oreolt: the van's out-of-state license plates, the large number of individuals in the van, their tired appearance, the smell emanating from the van indicating a long trip, and Cota-Herrera's apparent inability to respond to Oreolt's questions, posed in both English and Spanish, regarding whether the passengers were documented. Taken together, these facts establish the reasonable suspicion necessary to justify the fifteen- to twenty-minute detention of the van and its passengers until INS officials arrived.

Next, Cota-Herrera challenges the lawfulness of the detention once the INS officials arrived at the scene and then transported the group to the INS facility. Cota-Herrera complains that INS Agent White opened the door of the van and questioned its occupants without making an independent inquiry as to whether there was reason to suspect a violation of immigration laws. Given that Agent White's actions were informed by the call he received from Colorado State Patrol, requesting his assistance in investigating the van and its driver for possible alien smuggling, we hold that White's decision to approach the van and open the

sliding door was justified. See 8 U.S.C. § 1357(a)(1) (authorizing INS officials to interrogate, without warrant, "any alien or person believed to be an alien as to his right to be or to remain in the United States"); United States v. Hensley, 469 U.S. 221, 229–33 (1985) (holding that a police officer may, in detaining and questioning an individual, rely on a bulletin posted by another police department, as long as the department that posted the bulletin possessed reasonable suspicion to justify the stop and/or detention).

After asking the occupants about their legal status and receiving responses confirming that at least some of the passengers were undocumented, while receiving no responses indicating that anyone was properly documented, White was justified in transporting the passengers to the INS facility for further investigation and administrative processing. See United States v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002) (holding that an individual's admission of illegal-alien status creates probable cause for arrest); United States v. Santana-Garcia, 264 F.3d 1188, 1193 (10th Cir. 2001) (same). Based on the passengers' responses, White also had probable cause to arrest Cota-Herrera for a violation of federal immigration laws. See, e.g., 8 U.S.C. § 1324(a)(1)(A)(ii) (criminalizing the transport of undocumented aliens). Thus, we agree with the district court that "[t]he INS agents acted within their statutory and regulatory authority in taking all of the van occupants into custody for the purpose of determining the legality

of their presence in the United States." (1 R. Doc. 38 at 4.) For these reasons, we affirm the district court's conclusion that the detention did not violate the Fourth Amendment.

### III

Cota-Herrera also contends that his statements to law-enforcement officers violated his Miranda rights. Miranda, of course, involved the admissibility of a defendant's statements. 384 U.S. at 439. In denying Cota-Herrera's motions to suppress, the district court concluded that the claim was moot as the government did not seek to introduce into evidence any of Cota-Herrera's statements taken before he was informed of his Miranda rights. On appeal, Cota-Herrera proffers no support for the contrary conclusion, and concedes that these statements were not introduced at trial. See United States v. Minjares-Alvarez, 264 F.3d 980, 984 (10th Cir. 2001) (holding that because none of the defendant's statements obtained in violation of Miranda were submitted to the jury, "whatever deprivation of rights [defendant] may have suffered at that point did not affect his trial"). Further, there is no indication that evidence admitted at trial was derived from Cota-Herrera's statements taken before he was informed of his Miranda rights under the fruit-of-the-poisonous-tree doctrine. Cf. United States v. Patane, 304 F.3d 1013, 1029 (10th Cir. 2002) (suppressing the physical fruits of a

Miranda violation), cert. granted, 123 S. Ct. 1788 (2003).  Thus, we hold that the district court acted properly in dismissing Cota-Herrera's Miranda claim.

## IV

The judgment of the district court is **AFFIRMED**.


ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge