**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAQUEL CORTEZ,

Defendant-Appellant.

\----------------------------

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSEFINA REYES-MORENO,

Defendant-Appellant.

No. 19-2058

\----------------------------

No. 19-2059

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NOS. 2:18-CR-02639-KG-1 and 2)**

---

Daniel Rubin (Meghan D. McLoughlin, Assistant Federal Public Defender, on the joint briefs), Office of the Federal Public Defender, Las Cruces, New Mexico, for Appellants.

Jennifer Rozzoni, Assistant United States Attorney (John C. Anderson, United States Attorney, with her on the briefs), Office of the United States Attorney, Albuquerque, New Mexico, for Appellee.

Before **TYMKOVICH**, Chief Judge, **SEYMOUR**, and **MORITZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

After a routine traffic stop in New Mexico led to Raquel Cortez and Josefina Reyes-Moreno's indictment for conspiring to transport undocumented aliens, both defendants jointly moved to suppress evidence based on Fourth and Fifth Amendment violations they allege occurred during the stop. The district court found no constitutional violations and denied the motion.

We agree no constitutional violations occurred during the stop. No Fourth Amendment violation occurred because none of the law enforcement officers' initial questions impermissibly delayed the stop and, during the stop, the officers developed reasonable suspicion the defendants were transporting undocumented aliens, justifying a further detention until Border Patrol arrived. No Fifth Amendment violation occurred because neither Cortez nor Reyes-Moreno faced custodial interrogation during the stop, rendering the absence of *Miranda* warnings harmless.

We therefore AFFIRM.

# I. Background

Sergeant Alvarez, a New Mexico State Police Officer, was parked on State Road 80—a two-lane highway running north-south in southwest New Mexico —when he recorded a northbound pickup truck going 66 mph in a 55 mph zone. Sergeant Alvarez turned on his vehicle's emergency lights, triggering the vehicle's dashboard camera, and pulled the pickup over for speeding. The stop occurred about fifty miles from the Mexico border, and State Road 80 does not have a Border Patrol checkpoint on it.

Traveling in the pickup were six individuals: Cortez and Reyes-Moreno, two small children, and two adult male passengers. Cortez and Reyes-Moreno, who are biological half-sisters and U.S. citizens, were in the front seat along with one of the children, their nine-year-old niece. The other child, Cortez and Reyes-Moreno's eleven-year-old nephew, rode in the back with the two adult men.[1]

Sergeant Alvarez initially approached the vehicle and spoke to the driver, Cortez. They discussed how fast Cortez had been going, and Sergeant Alvarez asked for Cortez's license, insurance, and registration. Then, as was his practice, he asked Cortez to come stand at the front right bumper of his police vehicle. She

---

[1] Cortez and Reyes-Moreno's niece and nephew are children of a third sister who was not present at the stop.

obliged, and he followed her back to the squad car. According to his testimony, Sergeant Alvarez did not notice the male passengers in the back seat at this time.

Back at his police vehicle, while running Cortez's license through his computer system to check for outstanding warrants, Sergeant Alvarez asked Cortez a series of questions regarding her travel plans and whom she was traveling with. He asked where Cortez was coming from, where she was headed, and who was traveling with her. Cortez replied that she was coming from Douglas, Arizona—which lies right on the Mexico border—and that she was heading to Alabama with her sister, niece, and nephew. Cortez did not mention the two adult men in the back seat.

Sergeant Alvarez asked a few questions regarding the relationship between Cortez, Reyes-Moreno, and the children. He also inquired how long Cortez had been in Douglas, whether she was working there, and where and with whom she was staying while in Douglas. Cortez replied that she had not been working in Douglas, and had been staying with her boyfriend. When Sergeant Alvarez asked what he did for a living, she replied that he was a truck driver. Finally, Sergeant Alvarez asked whose truck Cortez was driving, to which she responded that it was Reyes-Moreno's vehicle.

Sergeant Alvarez then returned to the pickup to "check some numbers," while Cortez remained by the police vehicle. The officer later testified that he

was checking the truck's vehicle identification number at this time and the dashboard camera video shows he checked something on the driver's side of the truck. Sergeant Alvarez then walked around to the passenger side and asked Reyes-Moreno a series of questions similar to those he posed to Cortez.[2]

While talking with Reyes-Moreno, Sergeant Alvarez noticed the two adult men in the back seat of the pickup. He asked Reyes-Moreno about the men, and later testified that she became defensive "like she didn't want to be asked any questions about the people that she was with." R. at 108. Ultimately, Reyes-Moreno said she did not know the men and that she and Cortez had picked them up at a gas station. Sergeant Alvarez asked the men for identification. Initially, neither responded. They looked straight ahead "as if they didn't hear what [Sergeant Alvarez] said." R. at 101. After another inquiry, the men simply replied "no." *Id*.

At this point in time, approximately seven minutes into the stop, Sergeant Alvarez returned to his police vehicle and radioed for assistance from Border Patrol. He then proceeded to complete the remaining portions of the traffic stop, including discussing how fast Cortez had been going, what her options were for paying the ticket, and whether she planned to pay or contest the ticket.

---

[2] Specifically, Sergeant Alvarez asked where they were coming from; why they had been in Douglas; how long they had been there; and who had traveled there together.

Sergeant Alvarez also continued to ask Cortez questions regarding whom she was traveling with, the circumstances surrounding picking up the two men, and whether there are a lot of lakes in Alabama.[3] During this time, Sergeant Gomez, another New Mexico State Police Officer, arrived on the scene. She discussed Cortez's speed with Sergeant Alvarez and participated in some of the questioning of Cortez.

Approximately twenty minutes into the stop, Border Patrol arrived. Shortly thereafter, Sergeant Alvarez indicated the traffic stop had concluded, returning Cortez's license and providing her with a completed citation. In the subsequent immigration investigation conducted by Border Patrol, the two adult men admitted they were undocumented and present in the United States unlawfully.

As a result, Cortez and Reyes-Moreno were charged with conspiracy to transport undocumented persons under 8 U.S.C. § 1324(a)(1)(A)(v)(I). In district court, they filed a joint motion to suppress evidence and statements obtained from the traffic stop. Relying on *Rodriguez v. United States*, 575 U.S. 348 (2015), they argued that Sergeant Alvarez violated their Fourth Amendment rights by impermissibly extending the scope of the stop beyond its mission without independent reasonable suspicion. They also contended Sergeant Alvarez

---

[3] With respect to inquiring about lakes in Alabama, Sergeant Alvarez testified that "the address on the registration or on [Cortez's] license said something Lake, so I was just — I was having a conversation." R. at 121.

violated their Fifth Amendment rights by questioning them without first providing *Miranda* warnings.

The district court denied the motion. With respect to the Fourth Amendment claims, the district court rejected the notion that any of Sergeant Alvarez's conduct impermissibly extended the scope or duration of the stop. As to the Fifth Amendment claims, it found the circumstances of the stop did not necessitate *Miranda* warnings because neither Cortez nor Reyes-Moreno ever faced custodial interrogation. Cortez and Reyes-Moreno subsequently pleaded guilty, but reserved the right to appeal the district court's denial of their suppression motion.

## II. Analysis

Cortez and Reyes-Moreno allege the district court erred by denying their motion to suppress in the face of Fourth and Fifth Amendment violations.

When reviewing the denial of a motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment."[4] *United States v. McNeal*, 862

---

[4] This represents the standard of review on appeal when the government prevails. It is not the appropriate standard for the district court to apply in the first instance when hearing a motion to suppress evidence. The district court erred by doing so below. *See* R. at 66 (stating that "in deciding a motion to

(continued...)

F.3d 1057, 1061 (10th Cir. 2017) (quoting *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017)).

*A. Fourth Amendment*

The Fourth Amendment guarantees the right of people to be "secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a seizure for Fourth Amendment purposes, subject to the reasonableness requirement therein. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). To be reasonable, a traffic stop must be justified at its inception and the officer's actions must be "reasonably

---

[4](...continued)

suppress, the Court views the evidence in the light most favorable to the United States"). Our research discloses that multiple district courts in this circuit have committed the same error. *See, e.g.*, *United States v. Cruz*, 338 F. Supp. 3d 1235, 1240 (D.N.M. 2018); *United States v. Turner*, No. 13-40050-01-JAR, 2013 WL 5727404, at *9 (D. Kan. Oct. 22, 2013). On a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020).

Cortez and Reyes-Moreno argue in their reply brief that the district court's error requires reversal. But this argument comes too late. Where a litigant fails to raise an issue in an opening brief, that party waives that issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994). As we have repeatedly held, we "will not entertain issues raised for the first time on appeal in an appellant's reply brief." *Platt v. Winnebago Industries, Inc.*, 960 F.3d 1264, 1271 (10th Cir. 2020) (quoting *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005)). Accordingly, we decline to consider Cortez and Reyes-Moreno's argument with respect to the standard of review.

related in scope" to the "mission of the stop." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 356).[5]

An officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. An officer may not constitutionally prolong a stop beyond that point except where (1) the seized individual consents or (2) the officer has independent reasonable suspicion of criminal wrongdoing on behalf of the seized individual that justifies further investigation. *See Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354–57); *see also Pettit*, 785 F.3d at 1379 ("Continued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity.").

Cortez and Reyes-Moreno argue that Sergeant Alvarez unreasonably extended the scope of the stop by asking questions unrelated to the mission of writing a traffic citation, and that he did so without independent reasonable suspicion of criminal wrongdoing.[6] Taking these arguments in reverse order, we

---

[5] Cortez and Reyes-Moreno do not dispute that the stop was justified at its inception, requiring us to address only the second inquiry of whether it remained reasonable throughout.

[6] Cortez and Reyes-Moreno also contend Sergeant Alvarez lacked the authority to perform "the functions of an immigration officer," rendering the stop invalid. Aplt. Br. at 17 (citing *Arizona v. United States*, 567 U.S. 387, 408

(continued...)

conclude that Sergeant Alvarez developed reasonable suspicion approximately seven minutes into the stop and did not unreasonably prolong the stop through unrelated questioning before that point.

---

[6](...continued)
(2012)). It is true that Sergeant Alvarez may have lacked the authority to validly detain and investigate someone unlawfully present in the United States for civil immigration offenses. *See Arizona*, 567 U.S. at 413. But Congress explicitly granted him and other local police officers the authority to investigate and arrest individuals for the criminal activity at issue here—transporting undocumented aliens. 8 U.S.C. § 1324(c) ("No officer or person shall have authority to make any arrests for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and *all other officers whose duty it is to enforce criminal laws*." (emphasis added)); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013) ("Section 1324(c) allows state and local law enforcement officials to make arrests for violations of § 1324."); *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 464 (4th Cir. 2013) (same). Indeed, the Supreme Court even recognized this authority in *Arizona*—the only case Cortez and Reyes-Moreno rely on for their authority-based argument. 567 U.S. at 409 (recognizing 8 U.S.C. § 1324(c) as one "specific[] limited circumstance[] in which state officers may perform the functions of an immigration officer").

Consistent with this authority, our case law confirms local law enforcement may detain individuals for reasonable periods of time to await immigration officials where the officers have reasonable suspicion that illegal trafficking is occurring. *See, e.g.*, *United States v. Cota-Herrera*, 75 F. App'x 695, 698 (10th Cir. 2003) (reasonable suspicion of alien trafficking justified state trooper's fifteen-to-twenty minute detention until immigration officials arrived). Accordingly, it is clear Sergeant Alvarez was not acting outside of his authority, in investigating the transportation of undocumented aliens once he obtained reasonable suspicion that such criminal activity was afoot.

-10-

*1. Reasonable Suspicion*

Reasonable suspicion accrues when an officer possesses a "particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Pettit*, 785 F.3d at 1379 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This is not an onerous standard. *United States v. Kitchell,* 653 F.3d 1206, 1219 (10th Cir. 2011). Although the government bears the burden of demonstrating the reasonableness of the suspicion, it requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause. *Pettit*, 785 F.3d at 1379. The existence of reasonable suspicion does not require the officer to rule out the possibility of innocent conduct, and in assessing reasonable suspicion we defer to a police officer's training and ability to discern innocent conduct from suspicious behavior. *See United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).

The United States contends Sergeant Alvarez developed reasonable suspicion by the time he spoke to the two men in the back of the pickup, or approximately seven minutes into the stop. We agree. At this time, the totality of the circumstances included numerous factors indicating Cortez and Reyes-Moreno may have been engaged in criminal transportation of undocumented aliens.

First, the geography and context of the stop generated suspicion. *See United States v. Brignoni-Pence*, 422 U.S. 873, 884–85 (1975) (noting "proximity

-11-

to the [Mexico] border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant" factors in assessing reasonable suspicion of alien trafficking).  Here the stop occurred approximately fifty miles from the Mexico border, with Cortez and Reyes-Moreno traveling northbound away from the border on State Road 80.  This particular road adds to the reasonableness of suspicion because, as Sergeant Alvarez testified, State Road 80 is "unique" in that it is "the only route . . . directly from the border that doesn't have Border Patrol checkpoints."  R. at 14; *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (noting that one of the factors which contributed to the officer's reasonable suspicion was the unusual route taken by the defendants, which was commonly used by smugglers to avoid checkpoints); *see also United States v. Westhoven*, 562 F. App'x 726, 728 (10th Cir. 2014) (relying on testimony that "undocumented immigrant and drug smugglers used [Highway 80 in southern New Mexico] heavily due to the lack of border patrol checkpoints" in finding reasonable suspicion existed).  Cortez and Reyes-Moreno also both stated they were coming from Douglas, Arizona, which lies directly on the border with Mexico.  Although not inconsistent with an innocent explanation, these factors contribute to the reasonableness of suspecting Cortez and Reyes-Moreno of trafficking.  *Brignoni-Pence*, 422 U.S. at 884–85.

Second, Cortez and Reyes-Moreno's evasiveness with respect to their traveling companions contributes to the reasonableness of Sergeant Alvarez's suspicion. *See United States v. Cash*, 733 F.3d 1264, 1275 (10th Cir. 2013) (holding evasiveness in response to questioning supports reasonable suspicion). When initially asked with whom she was traveling, Cortez omitted any mention of the two adult men. Reyes-Moreno similarly appeared evasive and defensive when asked about the men. As Sergeant Alvarez testified, she reacted as if "she did not want to be asked any questions about the people she was with." R. at 29. Such attempts to avoid discussing the identity of, and relationship among, traveling companions contributes to the reasonable suspicion that some aspect of that identity or relationship is incriminating.

We routinely discount individuals' reactions to encountering law enforcement when they can be easily explained as the type of common response triggered by a police interaction. Indeed, we have recognized that mere nervousness does not alone generate reasonable suspicion because "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998). But here, the omissions and evasiveness of Cortez and Reyes-Moreno speak to a separate type of reaction not "normally anticipated during a citizen-police

-13-

encounter." *Pettit*, 785 F.3d at 1380 (finding extreme nervousness contributed to reasonable suspicion because it was a reaction not ordinarily expected during interactions with law enforcement). Ordinarily, citizens stopped for traffic violations would not conceal or otherwise fail to acknowledge the presence of traveling companions. Nor would they display a reluctance to discuss those individuals or their relationship with them. Accordingly, Cortez and Reyes-Moreno's abnormal reactions contribute to reasonable suspicion.

Third, the reactions of the men to Sergeant Alvarez's questioning confirmed his reasonable suspicion of Cortez and Reyes-Moreno. Not only did the men not possess identification, but they both were unresponsive and recalcitrant in the face of questioning. As Sergeant Alvarez testified, each looked "straight [ahead] as if they didn't hear" Sergeant Alvarez's questions. R. at 27–28. Given the context, geography, and other circumstances of the stop thus far, the men's reluctance to engage with law enforcement suggested that they may be undocumented aliens. This, in turn, supported the suspicion that those traveling with them—Cortez and Reyes-Moreno—were in the process of transporting them illegally.

Finally, Cortez and Reyes-Moreno's eventual explanations for traveling with the men—that they had picked them up as hitch-hikers from a gas station—contributed to reasonable suspicion despite being consistent and

-14-

ostensibly providing an innocent explanation for their conduct. *Pettit*, 785 F.3d at 1379 ("[F]actors consistent with innocent travel may contribute to reasonable suspicion."). Sergeant Alvarez was not required to credit their story, *see id.*, and it is understandable why he would not. After all, it is peculiar to some that two women entrusted with their sister's small children would pick up two strange men they met at a gas station and then permit them to travel alone in the back seat in close proximity to one of the children—an eleven year-old. Such "bizarre" choices can contribute to reasonable suspicion. *See United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009).

Of course, not every odd decision warrants suspicion simply "because it indicates a choice that the typical person, or the officer, would not make." *Simpson*, 609 F.3d at 1149. But here Cortez and Reyes-Moreno's decision to let their young nephew ride in the back with these men undercuts their proffered explanation that the men were complete strangers. Instead, their apparent comfort with the men suggests a closer relationship consistent with transporting them illegally. Although not alone sufficient to give rise to reasonable suspicion, this warrants consideration in the analysis.

On the whole, these circumstances established reasonable suspicion that Cortez and Reyes-Moreno were transporting undocumented aliens. Our conclusion in this respect gives significant weight to the proximity to the border

-15-

and the fact that State Road 80 is unique for having no Border Patrol checkpoints. Were a similar stop conducted in the middle of the country, our analysis might turn out differently. But here we conclude that, approximately seven minutes into the stop, Sergeant Alvarez possessed sufficient justification to detain Cortez and Reyes-Moreno in order to further investigate his suspicions of trafficking.

Cortez and Reyes-Moreno rely on *United States v. De La Cruz* to counter the suggestion that reasonable suspicion developed. *See* 703 F.3d 1193 (10th Cir. 2013). There, in assessing a stop that occurred in Tulsa, Oklahoma, we held an officer lacked reasonable suspicion to continue detaining the driver of a vehicle merely because a passenger—who was in the United States unlawfully—fled the vehicle upon encountering the police. *Id.* at 1196. We found the passenger's unlawful presence in the United States failed to generate reasonable suspicion with respect to the driver because such conduct constituted only a "status crime, which would not necessarily suggest that the driver of the vehicle . . . was also involved in criminal activity." *Id.* at 1198. We also rejected the government's theory that the driver could be reasonably suspected of transportation under 8 U.S.C. § 1324(a)(1)(A)(ii) because we found that statute precluded only transportation that "furthers an alien's violation" and does not "encompass persons who come into daily contact with undocumented aliens." *Id.* at 1199.

-16-

Cortez and Reyes-Moreno would have us extend *De La Cruz* to the present circumstances and hold that their passengers' unlawful presence cannot cast suspicion on Cortez and Reyes-Moreno, but the facts of the present case differ significantly. Unlike in *De La Cruz*, where we emphasized that the seizure occurred "a significant distance from the U.S. border," here the stop occurred only fifty miles from the Mexico border. *Id.* In fact, in *De La Cruz*, we considered that the reasonable suspicion analysis may differ in such circumstances. *Id.* at 1198 (noting that the analysis may be different "if the stop occurred close to the U.S.-Mexican border on a highway or road frequently used by illegal immigrants to enter the United States undetected"). The instant appeal presents such a case where the geography and context of the stop warrant a different outcome.

Moreover, unlike *De La Cruz*, here additional facts support suspicion of Cortez and Reyes-Moreno beyond mere proximity to those unlawfully present in the United States. For example, Cortez and Reyes-Moreno were evasive and defensive when asked questions about with whom they were traveling. When considered in conjunction with the location of the stop, these additional facts provide a much stronger basis on which to conclude reasonable suspicion of trafficking exists.

## 2. *Unreasonable Delay Under* Rodriguez

Having established reasonable suspicion accrued approximately seven minutes into the stop, justifying the extension until Border Patrol arrived, we turn to address whether any Fourth Amendment violation occurred prior to that point. Cortez and Reyes-Moreno argue Sergeant Alvarez unreasonably prolonged the stop through delinquency and by asking questions unrelated to the mission of issuing a traffic citation.

A traffic stop may "last no longer than is necessary" to complete the mission of the stop. *Rodriguez*, 575 U.S. at 354. The mission of the stop includes both addressing the traffic violation warranting the stop and attending to "related safety concerns." *Id.* at 354, 356 (holding "negligibly burdensome precautions" are permissible to protect officer safety in light of the fact that the government's "officer safety interest stems from the mission of the stop itself"); *United States v. Gurule*, 935 F.3d 878, 884 (10th Cir. 2019) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns.").

As a preliminary matter, to the extent Cortez and Reyes-Moreno argue Sergeant Alvarez was unreasonably delinquent in executing the citation during the first seven minutes of the stop, we reject that contention. "*Rodriguez* does not

prohibit all conduct that in any way slows the officer from completing the stop as fast as humanly possible." *United States v. Campbell*, 912 F.3d 1340, 1353 (11th Cir. 2019). Although it is appropriate to consider police diligence, *Rodriguez*, 575 U.S. at 354, the mere fact that an officer could, conceivably, have performed a task more quickly than he did fails, on its own, to generate a Fourth Amendment violation. "This is because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Mayville*, 955 F.3d at 827; *see also Rodriguez*, 575 U.S. at 354 (holding that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or *reasonably* should have been—completed" (emphasis added)).

Here, nothing suggests any unreasonable delay or delinquency in the manner Sergeant Alvarez conducted the first seven minutes of the stop. He testified that he completed the stop in a way that was consistent with his customary practice. And the dashboard camera reveals nothing to the contrary.

Thus, we turn to Cortez and Reyes-Moreno's primary argument—that Officer Alvarez impermissibly extended the stop by asking questions unrelated to its mission. This we similarly find unavailing.

Our precedents establish that, in the context of an ordinary traffic stop, law enforcement may engage in certain inquiries without running afoul of the Fourth Amendment. For example, an officer may perform those activities necessary to

completing the citation such as "request[ing] a driver's license and registration, run[ning] requisite computer checks, and issu[ing] citations or warnings." *Pettit*, 785 F.3d at 1379. An officer may also inquire about the driver's travel plans and the identity of the individuals in the vehicle. *Id.*; *United States v. Cone*, 868 F.3d 1150, 1154 (10th Cir. 2017) (finding general questions regarding travel plans and identity reasonable under the Fourth Amendment); *United States v. Morgan*, 855 F.3d 1122, 1126 (10th Cir. 2017) (holding officer's questions regarding identity did not exceed the scope of a *Terry* stop).

In addition, because "[t]raffic stops are especially fraught with danger to police officers," law enforcement personnel may take "certain negligibly burdensome precautions in order to complete [their] mission safely." *Rodriguez*, 575 U.S. at 356. These may include conducting criminal record checks, searching for outstanding warrants, or asking limited questions directed at ensuring officer safety. *Id.*; *Cone*, 868 F.3d at 1153–54.

What law enforcement may not do is divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes. *See Rodriguez*, 575 U.S. at 356 (holding "[o]n-scene investigation into other crimes . . . detours from [the] mission" of the stop); *Campbell*, 912 F.3d at 1353 ("[A] stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other

crimes"). Nor may an officer engage in "safety precautions taken in order to facilitate such detours." *Rodriguez*, 575 U.S. at 356.

With these principles in mind, we conclude none of Sergeant Alvarez's inquiries in the first seven minutes of the stop detoured from the stop's mission. First, Sergeant Alvarez was entitled to ask Cortez and Reyes-Moreno about their own identities and the identities of their traveling companions. *See Morgan*, 855 F.3d at 1126; *see also United States v. Fernandez*, 600 F.3d 56, 60 (1st Cir. 2010) ("[P]olice requests for identifying information typically do not trigger Fourth Amendment concerns."); *Stufflebeam v. Harris*, 521 F.3d 884, 888 (8th Cir. 2008) ("[A] police officer does not violate the Fourth Amendment by inquiring into the identity of a vehicle's passenger during the course of a lawful traffic stop, even absent reasonable suspicion that the passenger has committed a crime."); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) ("The police may ask people who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure.").

As we explained in *Morgan*, officer safety interests justify inquiries into identity because "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." 855 F.3d at 1126; *see also Cone*, 868 F.3d at 1154 (recognizing that inquiries as to identity are permissible for the purpose of protecting officer safety). Sergeant

-21-

Alvarez's inquiries into the identities of Cortez, Reyes-Moreno, their niece and nephew, and the two men fall into this category and are thus permissible.

Sergeant Alvarez was similarly entitled to inquire as to Cortez and Reyes-Moreno's travel plans. *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (holding "[a]n officer may . . . generally inquire about the driver's travel plans" without violating the Fourth Amendment). As we explained in *United States v. Holt*, such inquiries are justified because "[t]ravel plans typically are related to the purpose of a traffic stop." 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005).

Sergeant Alvarez's questions regarding where Cortez and Reyes-Moreno were coming from, where they were going, and how long they had stayed in Douglas are permissible as they fit into the travel plans rubric and relate to the mission of the stop. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) ("[A]n officer may routinely ask about travel plans . . . during a lawful traffic stop."). These questions could cast light on why Cortez had been speeding, tying them to the initial justification for the stop. *Holt*, 264 F.3d at 1221 (explaining that such inquiries "may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel)").

The questions relating to whether Cortez was working in Douglas, whom she was staying with while there, and what her boyfriend did for a living are farther afield. But we find these questions permissible as the type of "negligibly burdensome" inquiries directed at ensuring officer safety. *See United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("While a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety."). As Sergeant Alvarez testified, he routinely asks innocuous background questions to assess driver stress, nervousness, and evasiveness to help gauge the degree of caution necessary in conducting a stop. R. at 162 (testifying that he "engage[s] [people] in conversation . . . [f]or officer safety, to get a feel for what's going on, who you're dealing with"); *id.* (noting that his practice is to "have a conversation with [people] . . . on the side of the road we talk about travel itinerary, you know what brings them to New Mexico, and based on that, you know, we'll determine okay, it's common motoring public").

The specific questions Sergeant Alvarez posed here represent only a few conversational inquiries related to the identity and travel plans he and Cortez had been discussing. After asking them, apparently satisfied that more precautions were unnecessary, he immediately returned to the business of completing the stop. Such questioning is consistent with both the public's expectations regarding ordinary inquiries incidental to traffic stops and taking the least burdensome

-23-

approach to ensuring officer safety. *See Cone*, 868 F.3d at 1153–54 (holding asking a driver questions regarding his or her criminal history is justifiable as a negligibly burdensome inquiry in part because "allowing the officer to ask the question may provide important clues pertaining to safety, such as nervous or evasive responses").

Furthermore, after a review of the record, we are not convinced these questions were posed as a pretext to "facilitate" a detour into investigating other crimes. *See Rodriguez*, 575 U.S. at 356. A useful comparison here are the questions Sergeant Alvarez and Sergeant Gomez posed to Cortez in the last thirteen minutes of the stop. During that period, despite already knowing their identities, Sergeant Alvarez asked Cortez whether she and Reyes-Moreno were biological sisters, inquired whether there were a lot of lakes in Alabama, and asked Cortez a series of repetitive questions regarding how long Reyes-Moreno had been in Douglas. Both Sergeant Alvarez and Sergeant Gomez also inquired in depth regarding the circumstances of picking up the two men.

Unlike the questioning in the first seven minutes of the stop, these inquiries fail to relate to the mission of the stop. They neither helped investigate the original infraction—speeding—nor could they reasonably be characterized as relating to officer safety. Such inquiries could not be justified as an attempt to "get a feel for what's going on" or assuring the officers that Cortez did not pose a

threat.  R. at 162.  At this point in the stop, Sergeant Alvarez had already engaged Cortez in conversation.  After having made his preliminary inquiries, Sergeant proceeded with the traffic stop without taking any additional precautionary measures.  He even let Cortez stand next to him and his police vehicle while he completed portions of the citation.

Such an approach signals that from approximately seven minutes into the stop, Sergeant was comfortable with the fact that Cortez posed no threat to his safety, and no longer needed to take any precautions in that regard.  Accordingly, "view[ing] the officer's conduct through a filter of common sense and ordinary human experience," we can assume without deciding that Sergeant Alvarez's questioning of Cortez during the final thirteen minutes of the stop would have been impermissible, if it had not been justified by independent reasonable suspicion.  *See United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).

But in light of the reasonable suspicion that did accrue, that question is not before us.  And, in contrast to the questioning in the latter portion of the stop, we find Sergeant Alvarez's questioning in the first seven minutes of the stop permissible as related to the mission of the stop.  Accordingly, no Fourth Amendment violation occurred.

*B. Fifth Amendment*

Cortez and Reyes-Moreno also allege violations of their Fifth Amendment rights due to Sergeant Alvarez questioning them without providing *Miranda* warnings. But *Miranda* warnings only need to be given once a suspect is in "custody" and faces questioning that constitutes "interrogation." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). Here, neither Cortez nor Reyes-Moreno faced custody, precluding any Fifth Amendment violation.

An individual is in custody when a reasonable person in the suspect's position would understand his or her situation as "the functional equivalent of formal arrest." *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007). This is an objective inquiry that considers the totality of the circumstances. *Id.* at 1275. The Supreme Court clarified in *Berkemer v. McCarty* that investigatory detentions such as ordinary traffic stops generally fall short of placing the detainee in custody. 468 U.S. 420, 440 (1984) (holding the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*"); *see also United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) ("Generally, *Miranda* warnings are . . . not implicated in the context of a valid *Terry* stop.").

This general principle controls here. Nothing about the circumstances of the traffic stop suggest anything beyond an ordinary *Terry* stop occurred. As we observed

-26-

in *Eckhart*, the "police citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated than that surrounding [formal arrest]." 569 F.3d at 1275–76.

This precisely describes the circumstances of Cortez and Reyes-Moreno's detention. Sergeant Alvarez was conversational and non-threatening. *United States v. Rogers*, 391 F.3d 1165, 1170 (10th Cir. 2004) (subject not in custody where officers "were courteous and non-threatening"). He followed his normal practices in conducting the stop. No physical restraints were ever mentioned, threatened, or used. Nor was there ever a need to use, brandish, or even discuss Sergeant Alvarez's firearm. Indeed, the questioning of Cortez and Reyes-Moreno related mainly to run-of-the-mill traffic inquiries, and nothing in the record suggests the sort of encounter that would be comparable to a formal arrest. By all standards, the stop was an ordinary *Terry* stop lasting only twenty minutes. Accordingly, the general rule precluding the necessity of *Miranda* warnings in such circumstances applies.

Cortez and Reyes-Moreno cite to *United States v. Revels*—in which this court affirmed the suppression of statements obtained in violation of the Fifth Amendment—but that case is readily distinguishable. *See* 510 F.3d at 1271–72. In *Revels*, seven police officers entered the defendant's home at 6:00 AM by force to

execute a search warrant. They immediately handcuffed the defendant, who was wearing nothing but her underwear, and forced her to the ground. Subsequently, after searching the house and discovering a bag of cocaine, the officers uncuffed the defendant so she could change into clothes. Without re-cuffing her, three officers brought her into a separate room, held up the bag of cocaine in front of her, and asked questions in an "accusatory manner." *Id.* at 1276. At this point, the defendant provided incriminating statements she later sought, successfully, to suppress on the basis that she had never been properly *Mirandized*.

Due to the drastic differences in circumstances, *Revels* provides no support for the contention that Cortez and Reyes-Moreno's statements here should be suppressed. Sergeant Alvarez's polite questioning in the context of an ordinary traffic stop is a far cry from the intimidating, police-dominated atmosphere present in *Revels* in which law enforcement relied on force and physical restraints.

## III. Conclusion

For the reasons discussed herein, we conclude neither Cortez nor Reyes-Moreno suffered a Fourth or Fifth Amendment violation during the traffic stop. Accordingly, we **AFFIRM** the district court's denial of their joint motion to suppress.