**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOHN ELISHA MAYVILLE,

    Defendant - Appellant.

No. 19-4008
(D.C. No. 2:16-CR-00266-JNP-1)
(D. Utah)

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CR-00266-JNP-1)**
_____

Bretta Pirie, Assistant Federal Public Defender (Scott Keith Wilson, Federal Public Defender, with her on the brief), Salt Lake City, Utah, for Defendant-Appellant.

Stewart M. Young, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.
_____

Before **BACHARACH**, **BALDOCK**, and **MURPHY**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

Defendant–Appellant John Elisha Mayville pleaded guilty to possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and possession of an unregistered firearm silencer in violation of 26 U.S.C. § 5861(d). Exercising his right under the plea agreement, Defendant challenges the district court's

denials of his motions to suppress evidence of drugs and firearms seized from his car by Utah Highway Patrol troopers during a traffic stop. On appeal, Defendant argues the troopers violated his Fourth Amendment rights described in *Rodriguez v. United States*, 575 U.S. 348 (2015), because they unjustifiably prolonged the traffic stop beyond the time needed to complete the tasks incident to the stop's mission.

Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm. The Supreme Court's decision in *Rodriguez* constrains what law enforcement officers may do during a routine traffic stop in the absence of additional reasonable suspicion. But *Rodriguez* does not require courts to second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop. This is because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment. Because the traffic stop here did not exceed the time reasonably required to execute the tasks relevant to accomplishing the mission of the stop, Defendant's nineteen-minute roadside detention accorded with the Fourth Amendment's dictates. Thus, the district court did not err in denying Defendant's motions to suppress.

I.

Around 1:45 a.m. on May 6, 2016, Utah Highway Patrol Trooper Jason Tripodi stopped a red Audi for traveling 71 m.p.h. in a 60-m.p.h. zone, in violation of state law. After the Audi came to a stop, Trooper Tripodi observed the driver hunched over in the vehicle as if he was "trying to stash something or hide something." Trooper

2

Tripodi approached the Audi and spoke with Defendant, who was the driver and sole occupant of the vehicle, about his speeding.

During this initial interaction, which lasted about six minutes, Defendant informed Trooper Tripodi he was traveling to Grand Junction, Colorado, from Lake Havasu, Arizona. Trooper Tripodi asked for Defendant's license, registration, and proof of insurance. While Defendant searched for these documents, Trooper Tripodi noticed Defendant had trouble finding the requested paperwork. After several minutes, Defendant provided his out-of-state driver's license to Trooper Tripodi, but he was unable to produce any registration documents for the vehicle.

According to Trooper Tripodi, Defendant "seemed confused" and "wasn't able to multitask like a normal individual would be able to" during this initial interaction. Trooper Tripodi also observed that Defendant seemed like he "was drowsy, or something was wrong, something was up." Based on these observations, Trooper Tripodi asked Defendant if he "was okay" multiple times. Trooper Tripodi asked Defendant to accompany him to the patrol car to chat while he filled out the paperwork for the stop. Defendant declined this invitation and remained in his vehicle.

Around 1:52 a.m., seven minutes after the stop began, Trooper Tripodi returned to his patrol car and began filling out paperwork for the stop. He also radioed dispatch to run a records check on Defendant, which consisted of two components. First, Trooper Tripodi asked dispatch to run Defendant's license and check for warrants. Second, the trooper requested Defendant's criminal history through the Interstate Identification Index, commonly referred to as a Triple I check. After radioing dispatch

3

for the records, but before dispatch returned the results, Trooper Tripodi requested a narcotic detector dog. He then continued working on the citation, including "attempting to figure out whose vehicle it was because [Defendant] ha[d] no registration paperwork."

At approximately 1:59 a.m., Trooper Scott Mackleprang arrived at the scene with his narcotic detector dog, Hasso. At this point, Trooper Tripodi backed up his patrol car because he anticipated possibly "run[ning] through sobriety tests or something like that at a later point in the stop." After briefly speaking with Trooper Tripodi, who remained in his patrol car and continued to work on the citation, Trooper Mackleprang asked Defendant to exit the vehicle so he could screen it with Hasso. Because Defendant refused, Trooper Mackleprang requested Trooper Tripodi's assistance. Trooper Mackleprang observed that Defendant was "real slow to answer" and had delayed reactions, "almost like a blank stare," which caused him to suspect Defendant was impaired. Defendant ultimately exited the vehicle, and Trooper Tripodi patted him down for weapons.

Trooper Tripodi then stood with Defendant on the side of the road while Trooper Mackleprang had Hasso conduct a free-air sniff around the car. At approximately 2:05 a.m., Hasso alerted to the odor of narcotics in the vehicle. And less than thirty seconds later, dispatch responded to Trooper Tripodi's records request with information indicating Defendant had a criminal record. The entirety of the traffic stop, from Trooper Tripodi's initial contact with Defendant to Hasso's alert, lasted approximately nineteen minutes.

4

The subsequent search of Defendant's vehicle revealed a methamphetamine pipe under the driver's seat and two guns, one equipped with a silencer, in the engine compartment. In the trunk, the troopers found roughly a pound of methamphetamine, an ounce of heroin, and a scale. After discovering the guns and drugs, the troopers placed Defendant under arrest.

The grand jury indicted Defendant for possession of methamphetamine with intent to distribute, possession of heroin with intent to distribute, possession of an unregistered firearm silencer, and being a felon in possession of a firearm. Defendant filed two motions to suppress in the district court, asserting several grounds for suppressing the evidence seized during the traffic stop. As relevant here, he moved to suppress evidence of the drugs and firearms as fruit of an unlawful seizure under the Fourth Amendment. Specifically, Defendant argued Trooper Tripodi's unreasonable extension of the traffic stop resulted in the dog sniff and subsequent search of his vehicle.

After evidentiary hearings and oral arguments, the district court found the troopers testified credibly and concluded Trooper Tripodi's decision to run a Triple I check through dispatch did not unconstitutionally extend the traffic stop. Alternatively, the district court held the troopers possessed reasonable suspicion to prolong the traffic stop to determine whether Defendant was impaired. The district court accordingly denied Defendant's motions to suppress.

Defendant later entered a conditional guilty plea, reserving the right to appeal the district court's denials of his motions to suppress. The district court accepted the

plea and sentenced Defendant to 126 months' imprisonment. Exercising his right to challenge the denials of his suppression motions, Defendant timely filed his notice of appeal.

## II.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017) (quoting *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017)). Defendant does not contest the legality of the initial traffic stop. Rather, he contends the troopers' actions—namely, Trooper Tripodi's decision to run a Triple I criminal-history check—were unrelated to the mission of the traffic stop and extended its duration in violation of the Fourth Amendment. We disagree with Defendant's arguments.

## A.

A traffic stop, even if brief and for a limited purpose, constitutes a "seizure" under the Fourth Amendment and is subject to review for reasonableness. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). To be reasonable, a "traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'" *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (quoting *Rodriguez*, 575 U.S. at 356). Because Defendant does not contend the traffic stop was unjustified at its inception, our analysis

6

is limited to whether the stop's "manner of execution unreasonably infringe[d]" upon Defendant's Fourth Amendment rights. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

An officer's authority to seize a driver "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. Officers may not prolong a stop beyond that point for the purpose of detecting evidence of ordinary criminal wrongdoing unless separate reasonable suspicion exists to justify further investigation. *Id.* at 354–55. Even *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment. *Id.* at 355–57.

Defendant argues Trooper Tripodi unlawfully extended the stop because the Triple I criminal-history check had no relation to his speeding—the traffic infraction at issue—and is not one of the ordinary inquiries allowed under *Rodriguez*. But, as *Rodriguez* explained, an officer's mission during a traffic stop is both "to address the traffic violation that warranted the stop *and attend to related safety concerns*." *Id.* at 354 (emphasis added and citations omitted). To be sure, this mission "includes ordinary inquiries incident to" the traffic stop, which typically involve inspecting the driver's license, verifying the vehicle's registration and insurance coverage, and checking for any outstanding warrants against the driver. *Id.* at 355. Because, however, "[t]raffic stops are 'especially fraught with danger to police officers,'" *id.* at 356 (citation omitted), the Court has also included "negligibly burdensome" inquiries an officer needs to make "to complete his mission safely" among permissible actions incident to a traffic stop. *Id.* As *Rodriguez* explained, "[T]he government's officer safety interest stems from the mission of the stop itself." *Id.*

7

This court has routinely permitted officers to conduct criminal-history checks during traffic stops in the interest of officer safety. *See, e.g.*, *United States v. Burleson*, 657 F.3d 1040, 1046 (10th Cir. 2011) ("[A]n officer may run a background check on a motorist to check for warrants or criminal history even though the purpose of the stop had nothing to do with the motorist's history."); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("While a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety. Obvious precautions include running a background check on the driver . . . ." (citations omitted)). Notably, in *Rodriguez*, the Court cited with approval our decision in *United States v. Holt*, 264 F.3d 1215, 1221–22 (10th Cir. 2001) (en banc), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005), as an example of a proper inquiry during a traffic stop. *Rodriguez*, 575 U.S. at 356; *see also Cone*, 868 F.3d at 1153 (recognizing approval of *Holt* in *Rodriguez* and concluding an officer may reasonably ask questions about a driver's criminal history during a routine traffic stop). Our *Holt* decision, the Court ably noted, "recogniz[ed] [an] officer safety justification for criminal record and outstanding warrant checks." *Rodriguez*, 575 U.S. at 356. Thus, an officer's decision to run a criminal-history check on an occupant of a vehicle after initiating a traffic stop is justifiable as a "negligibly burdensome precaution" consistent with the important governmental interest in officer safety.[1]

---

[1] Several of our sister circuits have likewise concluded, post-*Rodriguez*, that an officer may conduct a criminal-history check as part and parcel of the mission of a traffic stop. *See, e.g.*, *United States v. Dion*, 859 F.3d 114, 127 n.11 (1st Cir. 2017) ("[T]he Supreme Court has characterized a criminal-record check as a 'negligibly

B.

Consistent with *Rodriguez* and circuit precedent, Trooper Tripodi was entitled to inquire into Defendant's criminal record during the traffic stop. But the question remains whether the troopers' conduct, including Trooper Tripodi's decision to request a Triple I check through dispatch rather than conduct the criminal-history check on the computer in his patrol car, was reasonable under the circumstances. *See United States v. Windom*, 863 F.3d 1322, 1327 (10th Cir. 2017) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'") (citation omitted). Defendant argues it was not. Again, we disagree.

To repeat, an officer's authority to seize a motorist "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. Thus, even ordinary inquiries incident to a traffic stop and permissible safety precautions must be completed within a reasonable amount of time. *Id.* at 357. In determining whether the duration of a traffic stop was reasonable, we consider

---

burdensome precaution' that may be necessary in order to complete the mission of the traffic stop safely.") (quoting *Rodriguez*, 575 U.S. at 356)); *United States v. Palmer*, 820 F.3d 640, 651 (4th Cir. 2016) ("A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop."); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) ("The trooper checked the occupants' criminal history on the computer in his car—a procedure permissible even without reasonable suspicion."); *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) (unpublished) ("Upon initially detaining the men, [the officer] reasonably addressed the traffic violation that warranted the stop and attended to safety concerns. For example, any preliminary delay in checking [the driver's] license, registration, and criminal history was justified as part of the stop.").

whether the officers diligently pursued the mission of the stop. *Id.* Accordingly, officers may not undertake safety precautions for the purpose of lengthening the stop to allow for investigation of unrelated criminal activity. *Id.* at 356.

With these principles in mind, and objectively considering the totality of the circumstances, we turn to examine Trooper Tripodi's decision to run a Triple I check. As explained above, an officer is permitted to run a criminal-history check as a safety precaution during a traffic stop so long as the check does not unreasonably prolong the stop. *See id.*; *Holt*, 264 F.3d at 1221–22. We see no reason to apply a different rule simply because an officer elects to conduct a Triple I check through dispatch rather than research a motorist's criminal history on the computer in his patrol car. *See United States v. McRae*, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996) (indicating, *in dicta*, it is reasonable for officers to run Triple I checks through dispatch as part of a routine traffic stop); *see also United States v. Hill*, 852 F.3d 377, 380, 383 (4th Cir. 2017) (holding, in the context of a twenty-minute stop, officers reasonably may search an additional database for criminal history even though it "can be a lengthy process").

Defendant argues the Triple I check unlawfully extended the traffic stop because Trooper Tripodi would have completed the stop sooner if he had confined himself to checking records via the computer in his patrol vehicle. The problem with Defendant's argument is twofold. First, the district court made a factual finding that the Triple I check did not extend the time period of the stop, and Defendant has not identified any evidence demonstrating the court's finding was clearly erroneous. Defendant points to evidence showing it took less than a minute for Trooper Tripodi's onboard computer

10

to return information that showed Defendant had a valid license, his car was insured, and the car was registered—though not to Defendant. But such a comparison is irrelevant to our analysis. As defense counsel conceded at oral argument, nothing in the record indicates how long it would have taken Trooper Tripodi to conduct either a criminal-history inquiry or warrants check on the computer in his patrol car.

Second, even if the Triple I check extended the duration of the stop, Trooper Tripodi's request for criminal-history records through dispatch was not unreasonable as a matter of law. Trooper Tripodi, who the district court deemed credible, testified that he conducted the Triple I check through dispatch because the computer in his patrol car provides limited information, especially with respect to out-of-state drivers. The record plainly shows Defendant provided an out-of-state license and was driving an out-of-state vehicle. Moreover, Trooper Tripodi developed concerns based on Defendant's apparent stashing of something under the driver's seat, Defendant's demeanor during their initial six-minute interaction, and Defendant's inability to provide registration paperwork for the vehicle. Given these circumstances, Trooper Tripodi's decision to run a Triple I check through dispatch—as opposed to limiting his records check to the computer in his patrol car—did not unreasonably prolong the stop.

Although Trooper Tripodi could have executed the traffic stop without running the records check through dispatch, and instead relied exclusively on the information available on the computer in his patrol car, his actions did not violate Defendant's Fourth Amendment rights. As the Court has repeatedly admonished, the Fourth Amendment does not require officers to use the least intrusive or most efficient means

11

conceivable to effectuate a traffic stop. *United States v. Sharpe*, 470 U.S. 675, 687 (1985) ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."). While we can imagine other situations in which an officer's decision to run a Triple I check through dispatch would unreasonably prolong a traffic stop, that is not the case here. The evidence in this case shows the troopers acted reasonably diligent in executing the tasks incident to the traffic stop, and their actions did not unlawfully extend the stop beyond the pursuit of the stop's mission.[2]

In sum, the district court determined dispatch responded to Trooper Tripodi's records request shortly after Hasso alerted to the presence of narcotics in Defendant's vehicle. Defendant has not shown, and we have not found, evidence in the record demonstrating this factual finding was clearly erroneous. Because the dog sniff and alert were contemporaneous with the troopers' reasonably diligent pursuit of the stop's

---

[2] Approximately twelve minutes passed between the time Trooper Tripodi returned to his patrol car after his initial interaction with Defendant and when Hasso alerted to the odor of narcotics in the vehicle. During this period, Trooper Tripodi radioed dispatch for records, worked on filling out paperwork for the stop, backed up his vehicle to possibly perform sobriety tests, assisted Trooper Mackleprang after Defendant refused to exit his vehicle, patted down Defendant for weapons, and further questioned Defendant outside of the vehicle during the dog sniff. Before Trooper Mackleprang arrived on the scene, Trooper Tripodi can be heard on his dash cam asking a voice-activated google device about Lake Havasu, Arizona. Defendant argues this shows Trooper Tripodi sat idle rather than performing the tasks incident to the traffic stop. The district court, however, credited Trooper Tripodi's testimony that during this time he was also filling out paperwork for the citation and attempting to figure out ownership of the vehicle. Defendant does not attempt to show this factual finding was clearly erroneous. Based on the record before us, none of the trooper's individual actions suggest a lack of diligence in pursuing the mission of the stop.

12

mission, the subsequent search of Defendant's vehicle and discovery of evidence did not violate his Fourth Amendment rights. The district court, therefore, properly denied Defendant's motions to suppress.[3]

* * *

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[3] Because Trooper Tripodi did not unconstitutionally extend the traffic stop by conducting the Triple I check through dispatch, we need not consider whether the troopers possessed reasonable suspicion to prolong the stop to investigate Defendant's potential impairment. We also summarily dispose of Defendant's meritless argument that the troopers acted unreasonably in removing Defendant from his vehicle during the traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (reaffirming rule that an officer may order a driver out of a vehicle during a traffic stop for officer safety reasons); *Holt*, 264 F.3d at 1222 (explaining an officer "may order the driver and passengers out of the vehicle in the interest of officer safety, *even in the absence of any particularized suspicion of personal danger*") (emphasis added).