**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

NEOAL GUYEAL HAYES,

    Defendant - Appellant.

No. 22-8010

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 1:20-CR-38-SWS-1)**

---

Stephanie I. Sprecher, Assistant United States Attorney (Nicholas Vassllo, Acting United States Attorney, with her on the brief), Casper, Wyoming, for Plaintiff-Appellee.

John C. Anderson, Holland & Hart, Santa Fe, New Mexico, for Defendant-Appellant.

---

Before **McHUGH**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

**PER CURIAM**.

---

After a drug-sniffing dog alerted to Defendant Neoal Guyeal Hayes' vehicle during a traffic stop, law enforcement officers uncovered 2,505 grams of methamphetamine and 10 grams of heroin inside a duffel bag located behind the driver's seat. Inside a backpack, also located behind the driver's seat, officers retrieved a small safe containing 30 grams of

methamphetamine, 20 grams of heroin, 35 grams of cocaine, 40 grams of Xanax, 8 grams of marijuana, a digital scale, packing material, and a 45 caliber handgun with one round in the chamber and a magazine containing nine rounds. Defendant Hayes subsequently entered a conditional guilty plea to one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). The district court sentenced Defendant to 120 months' imprisonment on Count 1 and 60 months' imprisonment on Count 2, to run consecutively. As part of his Rule 11 plea agreement, Defendant reserved the right to appeal the district court's denial of his motion to suppress evidence of the drugs and firearm. *See* Fed. R. Crim. P. 11(a)(2). Defendant now appeals.[1]

In reviewing the denial of a motion to suppress, "we view the evidence in the light most favorable to the Government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Cotto*, 995 F.3d 786, 794–95 (10th Cir. 2021) (quotation marks omitted).

In its order denying Defendant's motion to suppress, the district court provided

---

[1] Defendant had persistent conflict with the numerous attorneys the district court appointed to represent him. Over the course of proceedings in the district court, Defendant had six different counsel, five appointed and one retained. Defendant ended up representing himself with the assistance of stand-by counsel. The district court conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), and satisfied itself that Defendant understood the implications of proceeding *pro se* and knowingly elected to do so. For the record, Defendant's court-appointed appellate counsel has ably discharged his duties and provided Defendant with competent representation.

2

alternative bases for why the stop and search of Defendant's vehicle did not violate the Fourth Amendment. First, the court ruled the detaining officer's initial stop of Defendant's vehicle was justified because the officer reasonably suspected Defendant was driving on a suspended driver's license. The court further ruled the officer did not unreasonably prolong the stop when he allowed the canine to complete its sniff of Defendant's vehicle. Second, the court ruled the officer had reasonable suspicion that Defendant was transporting drugs, justifying both the stop and dog sniff of his vehicle. On appeal, Defendant acknowledges the stop of his vehicle was justified based on the officer's suspicion that his driver's license was suspended. But Defendant challenges all other aspects of the district court's ruling that his Fourth Amendment rights were not violated. Defendant argues the facts known to the officer did not establish reasonable suspicion that he was transporting drugs, such that the officer's stop and search of his vehicle cannot be justified on that basis. Defendant also asserts the officer unreasonably prolonged the traffic stop to pursue an investigation into drug trafficking that was unrelated to the original purpose for the stop.

Suffice to say we have carefully reviewed (1) the parties' briefs, (2) the oral argument recording, (3) the entire record on appeal, including the videos of the stop and the transcripts of the two hearings on Defendant's motion to suppress, and (4) the controlling Supreme Court and Tenth Circuit precedents applicable to each of Defendant's arguments. Having done so, we conclude the detaining officer did not violate Defendant's Fourth Amendment rights in this case. Accordingly, the decision of the district court denying Defendant's motion to suppress is AFFIRMED.

22-8010, *United States v. Hayes*
**BALDOCK**, Circuit Judge, concurring.


Our Per Curiam opinion suggests two possible ways to approach the district court's decision denying Defendant Hayes' motion to suppress.  One approach is not in itself preferable to the other because both involve constitutional interpretation.  Constitutional avoidance is not in play.  As per Judge Briscoe's preferred approach, we could apply well-established law and address whether reasonable suspicion of drug trafficking supported both the initial stop and subsequent search of Defendant's vehicle.  Given the somewhat confused state of Supreme Court and Tenth Circuit precedent on the question of when a traffic stop is unreasonably prolonged in violation of the Fourth Amendment, however, my preferred approach is otherwise.  I would accept Defendant's admission that reasonable suspicion of driving on a suspended license justified the detaining officer's initial stop of Defendant's vehicle.  In an effort to assist district courts by bringing some clarity to the law, I would then address the question of whether the manner in which the officer carried out the stop unreasonably prolonged the stop in violation of Defendant's Fourth Amendment right to be free from unreasonable seizures.  According to Defendant, Officer Eric Norris of the Cheyenne, Wyoming police department violated the Fourth Amendment as interpreted in *Rodriguez v. United States,* 575 U.S. 348 (2015), when he prolonged the traffic stop of Defendant's vehicle *for five seconds* to pursue an investigation of drug-trafficking activity unrelated to the initial purpose of the stop.  I would conclude he did not.

I.

Defendant was a suspected drug trafficker under investigation by the Drug Enforcement Agency (DEA) in cooperation with local law enforcement in Wyoming.  On February 29, 2020, Defendant was returning to Montana in his Cadillac Escalade after a suspected drug run to Colorado with his cohort, Iesha Dembo.  While Defendant and Dembo traveled northbound on I-25, Laramie County dispatch in Wyoming informed DEA Task Force Officer (TFO) Craig Sanne that Defendant's Colorado driver's license was suspended.  TFO Sanne shared this information with Officer Norris.  Sanne also informed Norris that Defendant was a suspected drug trafficker known to carry firearms and was thought to be transporting narcotics.  At around 6:51 p.m., Officer Norris stopped the Escalade on I-25 near its intersection with I-80 on the outskirts of Cheyenne.  Defendant was driving and Dembo was in the front passenger's seat.  Defendant pulled off on the left side of I-25 northbound.

Officer Norris exited his patrol car and approached the Escalade on the driver's side. As they had previously arranged with Officer Norris, Cheyenne police officers Sean Smith and Lisa Koeppel arrived on the scene at the same time as Norris and approached the passenger's side of the Escalade.  Officer Norris conversed with Defendant while Officer Smith made contact with Dembo.  To protect the investigation and ongoing surveillance of Defendant and his vehicle, law enforcement had made a tactical decision not to inform Defendant he was being stopped for driving with a suspended license. Rather, Norris advised Defendant that the Escalade's temporary tag was vibrating and difficult to read.  Norris

2

asked, "you got anything on that?" As Defendant gathered some paperwork, Officer Norris asked him to step out of the Escalade. Exactly what paperwork Defendant produced is unclear. Officer Norris testified at a suppression hearing that he did not ask for Defendant's license, registration, or proof of insurance because of the information he received from TFO Sanne about the real possibility Defendant was armed and transporting narcotics.

As shown on Officer Norris's body camera, once Defendant exited the Escalade, Norris instructed him to "turn and face the car, give me your hands." As he handcuffed Defendant at the back side of the vehicle, Officer Norris informed Defendant he was not under arrest; rather, Norris needed to check for weapons. Defendant, a large man, was wearing long pants and a hooded winter coat. As shown on Officer Norris's dash camera, while Norris secured Defendant, Officer Smith moved around the front of the vehicle to the driver's side closer to Norris and Defendant. Dembo remained seated in the vehicle alone. Officer Koeppel returned to her patrol car to retrieve her canine. When, seconds later, Officer Koeppel approached the back of the Escalade with her canine, Officer Norris moved Defendant backwards three steps, away from the vehicle. Norris looks to be adjusting Defendant's handcuffs all the while. As the canine moved counterclockwise around the Escalade and appeared at the vehicle's left front corner, Officer Norris looked to his left toward Officer Koeppel and her canine. This is the start of what Defendant refers to as the "*Rodriguez* moment," the five seconds at the end of which the canine alerted to the vehicle's rear driver's side door seam area. Defendant tells us—

the United States accurately sets forth the chronology of the traffic stop with

3

specific reference to the time intervals reflected on the video recordings of the stop. The United States correctly notes that at 4:33 on the body camera recording, Officer Norris completes the process of handcuffing Defendant. Officer Norris then informs Defendant that he is not under arrest, but only being detained. This advisement takes approximately three seconds and is completed at 4:36 on the body camera video. At this point the dog had not yet alerted to the presence of illegal drugs in the vehicle. Indeed, the United States acknowledges that this alert did not occur until 4:41 on [Officer Norris's] body camera video recording.

Def. Reply Br. at 1–2; *see also* Gov't Br. at 16. As soon as the canine alerted, Officer Smith removed Dembo from the vehicle and handcuffed her.

On appeal, Defendant argues that "[b]ecause the only appropriate basis for the stop was suspicion of driving under a suspended license, *any* detour from that investigation represents an unlawful extension of the stop." Def. Op. Br. at 12 (emphasis added). Defendant says that before the canine alerted to the presence of drugs in his vehicle, Officer Norris, at 4:36 on his body camera, completed patting Defendant down, handcuffing him, and informing him he was not under arrest. But according to Defendant, Officer Norris never took any steps to investigate the possibility that Defendant was driving on a suspended licence or to issue a citation for such violation before the canine alerted at 4:41 on Norris's body camera. Defendant therefore claims Officer Norris unlawfully prolonged the stop of Defendant's vehicle by five seconds to pursue a criminal investigation unrelated to the purpose of the stop in violation of the Fourth Amendment. In other words, Officer Norris's "failure [after 4:36 on his body camera] to take any action in furtherance of the investigation into the suspected traffic violation justifying the stop necessarily [and unreasonably] prolonged the stop." *Id.* at 12–13.

4

The *Rodriguez* issue thus turns on the legal and factual significance of the five seconds between 4:36 and 4:41 on the body camera video (*i.e.*, the time between Officer Norris' advisement to Defendant that he is being detained, and the dog alert, which occurs five seconds later). It is this five-second interval that Defendant contends was the "*Rodriguez* moment" (*i.e.*, the point at which officers ceased pursuit of the initial traffic violation in order to pursue investigation into unrelated criminal activity.).

Def. Reply Br. at 2. Defendant acknowledges this five-second interval was "scant," but says the Tenth Circuit "has repeatedly held that unsupported delay of *any* duration represents a Fourth Amendment violation." *Id.* at 4 (emphasis added). But this Court has never "held" any such thing. Moreover, the underlying premise of Defendant's claim—that the five second delay was "unsupported"—is misplaced.

## II.

As one might surmise, *Rodriguez* is a case about the (il)legality of a traffic stop's duration.[1] The issue in that case was "whether police routinely may extend *an otherwise-completed traffic stop*, absent reasonable suspicion, in order to conduct a dog sniff." 575 U.S. at 353 (emphasis added). The Court said no. The Court explained that "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. Still, the Court acknowledged that "the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention." *Id.* at 354 (citing *Illinois v. Caballes*, 543 U.S. 405,

---

[1] Inquiries into the authorized scope and duration of a traffic stop tend to merge. Once an officer exceeds the scope of or purpose for the stop, the duration of the stop may very well extend beyond the time necessary to address the tasks related to the traffic infraction. *See Rodriguez*, 575 U.S. at 354 ("Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." (quotation marks omitted)).

406, 408 (2005)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* "The seizure remains lawful only 'so long as unrelated inquiries do not *measurably extend* the duration of the stop.'" *Id.* at 355 (emphasis added) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).[2]

Notably, in *Rodriguez* the Supreme Court rejected the Eighth Circuit's conclusion that once the initial purpose of the stop had been served, the extension of a traffic stop for seven or eight minutes while the officer summoned a canine to perform a sniff was only a *de minimis* intrusion on Rodriguez*'s* Fourth Amendment rights and therefore permissible. In other words, the Supreme Court, at least in the context of the facts presented there, declined to recognize a *de minimis* exception in favor of law enforcement to the Fourth Amendment's reasonableness requirement. *See United States v. Clark, III*, 902 F.3d 404, 410 n. 4 (3d Cir. 2018). While a seven or eight minute delay is hardly comparable to a five second delay, Defendant reads *Rodriguez* to suggest we cannot simply declare the five seconds about which he complains a *de minimis* violation of the Fourth Amendment and leave it at that.

---

[2] *Johnson* addressed the authority of an officer to "stop and frisk" a passenger in a vehicle stopped for a traffic infraction. The entire statement in *Johnson* from which the quote in *Rodriguez* comes reads as follows: "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court had made plain, do not convert the encounter into something other than a lawful seizure so long as those inquiries do not *measurably extend* the duration of the stop." 555 U.S. at 333 (emphasis added). The online Cambridge Dictionary defines "measurably" as "in a way . . . that is *large enough to be noticed*." Cambridge Dictionary, https:// dictionary.cambridge.org/us/dictionary/english /measurably (last visited March 13, 2023) (emphasis added).

To be sure, in *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020), we read *Rodriguez* to say "[e]ven *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment." When read in the context of the seven or eight minute delay in *Rodriguez*, our statement is undoubtedly true. Nonetheless, our statement was obiter dictum because *Mayville* did not require us to decide whether any delay was unlawful. Rather, we concluded that "[b]ecause the dog sniff and alert were *contemporaneous* with the officer's reasonably diligent pursuit of the stop's mission," *i.e.*, the running of a criminal history check to ensure officer safety, the search of Mayville's vehicle was lawful. *Id.* at 833 (emphasis added).

Relying on *Rodriguez*, we explained that "[i]n determining whether the duration of a traffic stop was reasonable, we consider whether the officer diligently pursued the mission of the stop. Accordingly, officers may not undertake [unnecessary] safety precautions for the purpose of lengthening the stop to allow for investigation of unrelated criminal activity." *Mayville*, 955 F.3d at 831 (citation omitted). As with any stop, however, part of the officer's mission in *Mayville* was to attend to related safety concerns: "Because . . . traffic stops are especially fraught with danger to police officers, the [Supreme] Court has also included '*negligibly burdensome*' inquiries an officer needs to make to complete his mission safely among permissible actions incident to a traffic stop." *Id.* at 830 (emphasis added) (brackets, citations, and quotation marks omitted) (quoting *Rodriguez*, 575 U.S. at 356).

Our decision in *United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022), lands closer to Defendant's mark but still falls short. During a routine traffic stop for speeding and improperly changing lanes, the officer became suspicious of Frazier. Faced with an entirely

7

different and apparently non-threatening set of circumstances in that case, the officer let

Frazier remain in his own vehicle while he took a three minute detour from the mission of

the stop to contact a canine unit. Nothing in our opinion suggests the facts known to the

officer amounted to reasonable suspicion. After questioning Frazier, the officer returned to

his squad car but did not begin the standard procedures necessary to issue a citation:

> Instead, [the officer] immediately began trying to contact . . . a canine handler with the local sheriff's office, so he could come to the scene and perform a dog sniff of the vehicle. At first, the trooper tried contacting the deputy via the instant-messaging system on his vehicle's computer. When the deputy failed to respond to several messages, [the officer] tried to call him on the radio. When the deputy again failed to respond, the trooper asked dispatch to locate him and send him to the scene.

*Id.* at 1171. We held that by spending approximately three minutes trying to arrange a dog

sniff before beginning "the standard procedures necessary to issue a citation," the officer

"diverted from the traffic-based mission of the stop [*i.e.*, its scope] and thereby [unlawfully]

extended its duration." *Id.* at 1171, 1173.

Considered in light of our precedents, the present appeal is a good example of why,

in adjudicating the reasonableness of a seizure, we should avoid drawing bright lines and

placing rigid time limitations on law enforcement. As *Frazier* illustrates, application of the

Fourth Amendment's reasonableness standard turns on the facts of each case. In addition to

the other significant factual differences between our case and *Frazier*, a three minute

diversion is 36 times longer than a five second diversion. The officer's diversion in *Frazier*

is much more comparable to the seven or eight minute diversion the Supreme Court

disapproved of in *Rodriguez*. This certainly is not to say that what one might consider a *de*

8

*minimis* delay (however the nebulous phrase is defined) never violates the Fourth Amendment. *Rodriguez* rejected this precise proposition. *Rodriguez* requires courts to consider *de minimis* delays, like all others, under the Fourth Amendment's reasonableness standard. In evaluating whether a seizure is unreasonable, "[m]uch as a 'bright line' would be desirable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Fourth Amendment is not a guarantee against all seizures, but only against unreasonable seizures. Regardless of how long the delay is that purportedly renders a traffic stop unconstitutional, the "central inquiry" under the Fourth Amendment is the reasonableness "in all the circumstances" of the seizure. *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

Defendant effectively endorses a rule that would create a per se violation of the Fourth Amendment's proscription against unreasonable seizures anytime an officer appears to so much as pause or "go off course," however briefly, while pursuing the mission of the stop. After all, Defendant tells us that "unsupported delay of *any* duration" violates the Fourth Amendment. Def. Reply Br. at 4 (emphasis added). Under Defendant's approach, an officer's failure to continue to pursue the mission of the stop for even one or two seconds would render a defendant's detention unlawful as a matter of law. But neither *Rodriguez* nor our own precedent prohibit in the name of efficiency "all conduct that in any way slows the officer from completing the stop as fast as humanly possible." *United States v. Cortez*, 965 F.3d 827, 837 (10th Cir. 2020). This is because "reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Id.* at 838 (quoting *Mayville*, 955 F.3d 827).

9

Defendant's approach simply is at odds with the Fourth Amendment's reasonableness requirement. *See Sharpe*, 470 U.S. at 686.

III.

The underlying foundation on which Defendant's claim rests is no more secure than his reading of the applicable caselaw is sound. Defendant says that just prior to the five second "*Rodriguez* moment," Officer Norris had finished addressing safety concerns. But until Defendant's and Dembo's formal arrest and preparation for transfer, the situation Officer Norris confronted, together with Officers Smith and Koeppel, was hardly benign. We have learned that in the traffic stop context, the stop's mission determines the permissible extent and duration of police inquiries and other activities. This mission is "to address the traffic violation that warranted the stop, *and attend to related safety concerns.*" *Rodriguez*, 575 U.S. at 354 (emphasis added) (citation omitted). To be sure, safety concerns are present in every traffic stop. But surely no one could disagree that these concerns vary depending on the facts known to the officer responsible for the stop. Traffic stops of criminal suspects like Defendant, who law enforcement have sound reason to believe are transporting narcotics and carrying firearms, "are especially fraught with danger to police officers, so an officer may need to take certain 'negligibly burdensome' precautions in order to complete his mission safely." *Id.* at 356 (citation and quotation marks omitted). "The risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a [traffic] violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Johnson*, 555 U.S. at 331 (quotation marks omitted).

10

And because Defendant traveled with a companion, one must remain mindful that "[t]he same weighty interest in officer safety . . . is present regardless of whether the occupant of the stopped car is a driver or passenger." *Id.* (quotation marks omitted). "The motivation of a passenger to employ violence to prevent apprehension of [a more serious] crime . . . is every bit as great as that of the driver." *Id.* at 331–32 (brackets and quotation marks omitted). "The risk of harm to both the police and the occupants of a stopped vehicle is minimized . . . if the officers routinely exercise unquestioned command of the situation." *Id.* at 330 (brackets and quotation marks omitted). Indeed, we heeded this admonition in *Cortez*, where we acknowledged that certain questions related to what the driver's boyfriend did for a living and where she had been staying and working in Douglas, Arizona, her point of origin, were arguably outside the stop's mission. Nonetheless, recognizing that "an officer has wide discretion to take reasonable precautions to protect his safety," we concluded "these questions [were] permissible as the type of 'negligibly burdensome' inquiries directed at ensuring officer safety." *Cortez*, 965 F.3d at 839 (quotation marks omitted).

Once the critical five seconds commenced in our case, the risk of violence or resistance remained from the fact that (1) Dembo remained in the Escalade unencumbered and unaccompanied, (2) officers had not yet uncovered the large quantity of drugs Defendant and Dembo were transporting, and (3) Defendant was known to traffic drugs and carry firearms. *See Johnson*, 555 U.S. at 331–32. After Officer Norris handcuffed Defendant and told him he was not being arrested but only detained, the canine had sniffed three-quarters or so of the Escalade. It was not only objectively reasonable but also quite prudent that

11

Officer Norris exercised "unquestioned command" over the situation and waited an extra five seconds, presumably to ascertain what he was faced with and what course he would pursue. *Id.* at 330.  As the district court effectively found, the five seconds about which Defendant complains was not a long enough period for Officer Norris, who was holding on to Defendant throughout the dog sniff, to accomplish anything.  This five seconds did not "measurably extend" the traffic stop.  *Rodriguez*, 575 U.S. at 355.  Rather, Officer Norris's five second pause, if that is what one wishes to call it, is the sort of "negligibly burdensome" precaution taken to assure everyone's safety in an uncertain and tense situation along a busy interstate, and that is reasonable.  *Id.* at 356.

No. 22-8010, *United States v. Hayes*
**BRISCOE**, Circuit Judge, concurring.

While I agree that the district court's denial of Hayes's motion to suppress should be affirmed, I reach that result by a different route. In this case, law enforcement had reasonable suspicion—before, during, and after the traffic stop—that Hayes was involved in drug trafficking. Therefore, when Hayes was stopped, the officers were permitted to take the time reasonably required to investigate not only Hayes's suspended license, but also his suspected drug trafficking. Neither the scope nor the duration of the stop, when viewed in that context, violated the Fourth Amendment.

Hayes does not dispute that law enforcement initiated a lawful traffic stop after learning he was driving with a suspended license. Instead, Hayes challenges the district court's conclusion that law enforcement had reasonable suspicion that he was engaged in drug trafficking, and, on that basis, that the traffic stop was independently justified and the duration of the stop legally prolonged.

Contrary to Hayes's views, the officers had reasonable suspicion prior to the traffic stop that Hayes was also involved in drug trafficking. Through their use of GPS location data from Hayes's phone, along with phone records made available through a pen register, law enforcement learned not only his travel history but also his call history. Law enforcement learned that Hayes had made multiple short trips between Billings and Denver, which, in task force officer (TFO) Sanne's training and experience, were consistent with drug trafficking. *See United States v. Arvizu*, 534 U.S. 266, 276 (2002) (noting that, when reviewing for reasonable suspicion, an officer is "entitled to make an

assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants"). In one example, only three weeks prior to Hayes's arrest, GPS location data indicated that Hayes made a trip from Billings to the Denver area, and surveillance confirmed Hayes was on that trip with Dembo—a known drug trafficker in the Billings area. *See Shaw v. Schulte*, 36 F.4th 1006, 1015 (10th Cir. 2022) ("Circuit precedent identifies Denver as a 'known drug source area' such that an individual's intended travel to Denver can [minimally] add to the reasonable suspicion calculus." (citation omitted)). Then, days later, GPS data indicated that Hayes made another quick trip to the Denver area and returned for a short stay in Cheyenne before heading north to Montana.

To be sure, it is not simply Hayes's short, frequent trips between Montana and Colorado that supported law enforcement's reasonable suspicion that Hayes was engaged in drug trafficking. *See United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir. 2015) ("[W]e have been reluctant to deem travel plans implausible . . . where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." (internal quotation marks and citation omitted)). Hayes traveled with a person known to be involved in drug trafficking (Dembo); he visited a residence that was known from law enforcement's prior investigations to be associated with the distribution of controlled substances; and his call records showed contact with known drug users and distributors in Cheyenne. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (noting that while "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," such association is a relevant factor). TFO

2

Sanne interviewed witnesses who identified Hayes by a photograph, described the type of car he drove (a gold Cadillac Escalade), and stated that Hayes was involved in drug trafficking.

On the day of the arrest, Hayes was making one of his short, but frequent, trips between Montana and Colorado. He was traveling again with Dembo. He stopped at a hotel—where he was not staying—for under two hours. And, while law enforcement did not see him walk into the hotel, they saw him leave with two bags, which he put behind his seat in the Escalade. In addition to all of this, law enforcement had knowledge of Hayes's criminal history, which included convictions and arrests for dealing controlled substances. *See United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.").

The officers did not simply "label [Hayes] as a drug dealer and then view all of [his] actions through that lens." Aplt. Br. At 29 (quoting *United States v. Drakeford*, 992 F.3d 255, 264 (4th Cir. 2021)). Law enforcement conducted background investigation into Hayes's travel and phone records, as well as his known associates. The results of this investigation, along with Hayes's actions on the day of his arrest, when viewed in their totality, supported law enforcement's reasonable suspicion that Hayes was involved in drug trafficking. *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (discussing that the reasonable suspicion standard "takes into account the totality of the

3

circumstances—the whole picture" (citation omitted)). The officers had reasonable suspicion that Hayes was involved in drug trafficking.[1]

Further, after stopping Hayes, law enforcement reasonably pursued investigation into Hayes's suspected drug trafficking. The stop did not exceed the scope of that investigation, nor was the stop unduly prolonged. The three officers initially at the scene of the traffic stop wasted no time. Officer Norris was at the driver's side window of the Escalade within seconds of pulling over the vehicle. Right away, he informed Hayes about the reason for the stop, provided Hayes a few moments to secure his registration materials, and then asked Hayes to get out of the vehicle. Almost immediately, as Officer Norris patted down and handcuffed Hayes, Officer Koeppel began walking the drug dog around the Escalade. The drug dog alerted to the presence of narcotics three-and-a-half minutes into the traffic stop. Of course, there is no bright-line rule that three-and-a-half minutes is always an acceptable amount of time to investigate for drug trafficking, *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) ("The reasonableness of a seizure, however, depends on what the police in fact do."), but it certainly highlights the speed at which law enforcement acted to investigate their reasonable suspicion of drug trafficking.

---

[1] Hayes challenges the credibility of TFO Sanne and his reliance on tips from confidential informants. However, TFO's Sanne testified that he based his conclusions on investigations and experience in law enforcement, *see, e.g.*, ROA, Vol. III at 62, 122–23, 135; Supp. ROA at 148–50, and law enforcement is allowed to consider an informant's tips when forming reasonable suspicion, *see United States v. Elkins*, 70 F.3d 81, 83 (10th Cir. 1995) ("Tips, even if anonymous, coupled with independent police work, provide reasonable suspicion to warrant an investigative stop.").

4

After the drug dog alerted, the officers had probable cause to arrest Hayes, and any time expended thereafter is irrelevant to any concern regarding the duration of the initial stop.

In sum, I would affirm the district court on the grounds that the officers acted within the scope of the Fourth Amendment by taking reasonable steps to investigate their reasonable suspicion that Hayes was involved in drug trafficking. Neither the scope nor the duration of the stop violated the Fourth Amendment.

5