FILED
United States Court of Appeals
Tenth Circuit

May 12, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

RICARDO VALADEZ-VALADEZ,

        Defendant - Appellant.

No. 06-2341

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-06-1159-WPJ)**

---

Lawrence E. Chacon, Albuquerque, New Mexico, for Defendant - Appellant.

Laura Fashing, Assistant United States Attorney (Larry Gomez, Acting United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **HARTZ**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

      On April 7, 2006, an officer of the New Mexico State Police stopped

Defendant Ricardo Valadez-Valadez's pickup truck along U.S. Highway 64 near

Tierra Amarilla, New Mexico. The officer testified that he stopped the truck

because it was obstructing traffic by traveling too slowly. In the truck were 21 passengers, including some who were unlawfully in this country. Mr. Valadez-Valadez was indicted in the United States District Court for the District of New Mexico for transporting illegal aliens. *See* 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(I), (a)(1)(A)(v)(II). Contending that the stop of his pickup truck violated the Fourth Amendment, he filed a motion to suppress the evidence obtained during the stop. After the district court denied his motion, he entered a conditional plea of guilty to the indictment, reserving his right to appeal the denial. We have jurisdiction under 28 U.S.C. § 1291 and reverse because the stop was not supported by reasonable suspicion.

## I.    BACKGROUND

### A.    Officer Lance Pepper's Testimony

At the suppression hearing State Police Officer Lance Pepper testified that he was driving east on Highway 64 near Tierra Amarilla when he came upon Mr. Valadez-Valadez's vehicle. He described the encounter as follows:

A:    I followed the vehicle for probably several miles. It was running about 45 miles per hour in a 55-mile-per-hour zone.
Q:    Can that create a problem on the highway?
A:    Yes, sir, it can.
Q:    And can you describe for me what that problem is?
A:    Especially the area that it was in, there's multiple blind curves and so forth. They're not real sharp corners or anything, but there is trees and so forth on the side of the road. If somebody were to come up behind them at a high rate of speed, it could cause an accident.

Q:    And did you observe—while you were following the truck, did you observe any other vehicles in the area?

A:    Yes, sir.  After I followed the vehicle for several miles, another vehicle pulled up behind me for several more miles.  The vehicle that I was following, the black Chevy pickup or black GMC pickup did not change its speed.  It stayed at ten miles per hour under the speed limit.

Q:    And in a situation like this, what typically would you do in response to—to someone who's driving that way?

A:    Generally, I'll stop the vehicle, approach it, make contact with the driver.  If everything's okay, then generally what I'll do is I'll advise them that they need to either pick up the pace, follow the speed limit, or move out of the way of traffic if it comes into the way.  And at that point in time, I'll usually just advise the subject that I'm going to give them a verbal warning.

R. Vol. III at 9–10.  Accordingly, Pepper stopped Mr. Valadez-Valadez.

Pepper issued Mr. Valadez-Valadez a citation rather than just giving a warning, because of the discovery of the aliens.  The citation was for a violation of N.M. Stat. Ann. § 66-7-305(A) (2003), which prohibits impeding traffic.  On the citation Pepper "marked the traffic conditions as being medium; the weather conditions as being clear; the road conditions as being dry; the light, it was light at the time of the stop; and that it was not an accident."  *Id.* at 14.

Defense counsel questioned Pepper regarding the apparent absence of speed-limit signs in the area where the stop occurred:

Q:    Okay.  Now, where's the speed limit that says 55 from that turnoff [where U.S. 64/84 becomes U.S. 64] to where you stopped him?

A:    I honestly couldn't tell you exactly.  I can't remember exactly where the sign is, some time after you leave U.S. 64/84.

Q:    Do you know for sure if there's a sign there at all?

A: I'm not a hundred percent, but I'm pretty much positive that there is one.
Q: How often are those speed limit signs?
A: They are not very often.
Q: Okay. So it could have been after the spot that you stopped the individuals, correct?
A: No, sir. It would be before that.
Q: But you don't know exactly?
A: I don't know exactly, no, sir.
Q: And you don't know exactly if there was one?
A: No, sir.
Q: You're—okay.
A: It's—as I recall it, I believe the speed limit sign actually changes not too far from where I pulled the vehicle over, because it starts—where I pulled him over is pretty much the start of a mountain pass.
Q: So right where you stopped him, the highway's going up?
A: Approximately another mile up the road, it starts going up.
Q: Okay. And what happens to the speed limit at that point?
A: I believe that it drops. I can't remember for sure, but I believe that it drops.

*Id*. at 18–19. Also on cross-examination Pepper reiterated his testimony that another vehicle pulled up behind him as he was following Mr. Valadez-Valadez. He stated that there had been no other vehicles driving behind him, that there had been no vehicles parked on the side of the road, and that there had been "occasional traffic" in the oncoming lane, *id*. at 22, which he later clarified as "at least three" vehicles, *id*. at 23. Pepper agreed that the stop occurred where the road was striped as a passing zone, and that he could have passed Mr. Valadez-Valadez without breaking the law.

Defense counsel then questioned Pepper about his experience patrolling this portion of Highway 64. Pepper acknowledged that it is "not unusual" for local

-4-

trucks to drive below the speed limit when carrying large loads.  *Id*. at 24.  Asked whether he stops every vehicle that travels 45 m.p.h. in a 55 m.p.h. zone, Pepper responded, "Not every vehicle, no, sir, but I do make traffic stops.  It's like I say, generally is what I'll do is I'll check and make sure everything's okay.  If everything is okay, is what I will do is tell them they either need to pull over or pick up the pace to travel with the rest of the flow of traffic."  *Id*.

Counsel asked Pepper why he decided to stop Mr. Valadez-Valadez:

Q:    So the reason you stopped this one is because you thought there was something more going on than just—
A:    No, sir.  *The actual reason that I stopped the vehicle was because it was impeding the vehicle behind it.  Just before we are about to start climbing a mountain pass, generally whenever you start climbing a mountain pass, you usually slow down more.  And once you get into the start of that mountain pass, there are not a whole lot of passing zones for a good distance.*
Q:    Once you're on—I'm sorry.  I'm sorry.  Go ahead.
A:    *Once you start into the mountain pass, there are not a whole lot of passing zones for—*
Q:    But if you're on an incline and you have a load, you're probably going to go slower than 55, correct?
A:    Generally, yes, sir.
Q:    Okay.  So it's only illegal if you're impeding traffic.  It's not illegal to slow your vehicle down.  That's basically the law, right?
A:    I don't understand what you're saying there.
Q:    If you're on any road in New Mexico and you drop below the speed limit, I mean, it's clearly illegal to go above that speed limit.  That's why they call it a speed limit.
A:    Yes, sir.
Q:    But there's no—in this area, there's no signs that say, "Minimum"; is that correct?
A:    No, sir.

*Id*. at 33–34 (emphasis added).

The district court also questioned Pepper. When the court inquired about the "potential hazards" of traveling below the speed limit on roads such as Highway 64, Pepper said: "[I]t could lead into an accident, somebody coming around the corner from behind and hitting from behind. That's generally my main concern." *Id*. at 41. Pepper said that Mr. Valadez-Valadez had been driving at approximately the same speed from the time Pepper first observed him to the time Pepper engaged his emergency equipment. Asked whether Mr. Valadez-Valadez ever had driven at a faster rate, Pepper answered: "I don't recall the vehicle ever going above 45 or much above. I mean, it would vary a little bit right there in that area of 45, but it never at any point in time do I ever recall it actually getting up to the speed limit." *Id*. at 42. He also did not recall seeing Mr. Valadez-Valadez apply his brakes when Pepper first came upon him.

## B.    The District Court's Ruling

The district court denied Mr. Valadez-Valadez's motion to suppress. It adopted Pepper's version of events (Mr. Valadez-Valadez's testimony at the hearing had disputed the officer's description of traffic and road conditions) and stated:

> I'll find that, on April the 7th, 2006, Officer Lance Pepper, a New Mexico State Police officer, was patrolling in the vicinity of Tierra Amarilla in Rio Arriba County, New Mexico. Officer Pepper turned onto Highway 64 east, heading towards Taos. Shortly after coming or entering Highway 64 east after he had been patrolling in

the vicinity of Tierra Amarilla, he came upon a black Chevrolet pickup truck with a camper shell on the back of it . . . .

Officer Pepper testified that the speed limit in that area is 55 miles an hour and that the black Chevrolet pickup truck was traveling approximately 45 miles per hour, ten miles below the speed limit. Officer Pepper testified he followed the vehicle several miles and then determined to initiate a stop for impeding traffic based on New Mexico Statute 66-7-305, which states that, "A person shall not drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or to be in compliance with the law."

I find credible Officer Pepper's testimony that the highway conditions that morning were dry—that is, the conditions on the road—that it was light, it was clear, and the weather was otherwise in good conditions. Considering the time of the year, there may very well have been some snow in shaded areas or possibly in ditches, but I do find, as I stated, the officer's testimony to be credible and will find that the road conditions were dry and the weather was clear.

Officer Pepper testified that the purpose of the stop was because he considered it to be an unsafe condition on that particular road, Highway 64, for a vehicle to be going ten miles below the speed limit because of the curves on that road and the potential to have a vehicle rear-ended. His intentions were to issue a verbal warning to the driver to pick up the speed and drive the speed limit.

. . .

I find that Officer Pepper had probable cause to believe that the driver of the pickup truck had violated the traffic laws of the State of New Mexico by impeding traffic.

*Id*. at 65–67.

## II.    DISCUSSION

"The validity of a traffic stop under the Fourth Amendment turns on whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Tibbetts*, 396 F.3d 1132, 1137

(10th Cir. 2005) (internal quotation marks omitted). Mr. Valadez-Valadez does not challenge on appeal the district court's findings of historical fact. Given those facts, we review de novo the ultimate question of reasonableness. *See United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008). When, as here, the meaning of a state traffic law is at issue, we construe the law de novo. *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004). Although "[a]n officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop . . . [, an officer's] failure to understand the plain and unambiguous law he is charged with enforcing . . . is not objectively reasonable." *Id*. at 1144–45. "[T]he dispositive inquiry is whether [state law] provided [the officer] with an objectively justifiable basis for [the stop]." *Id*. at 1145 (emphasis omitted).

Mr. Valadez-Valadez contends that Officer Pepper lacked reasonable suspicion to believe that he was impeding traffic under N.M. Stat. Ann. § 66-7-305(A), which states:

> A person shall not drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or to be in compliance with law.

We agree with Mr. Valadez-Valadez's contention.

To begin with, we join what appears to be a consensus of courts that driving at a speed moderately below the speed limit does not, without more,

-8-

constitute obstructing or impeding traffic. *See, e.g.*, *State v. Bacher*, 867 N.E.2d 864, 867–68 (Ohio Ct. App. 2007) (defendant driving 42 m.p.h. in 65 m.p.h. zone; no reasonable suspicion that defendant was impeding traffic); *State v. Whelchel*, 604 S.E.2d 200, 202 (Ga. Ct. App. 2004) (defendant, traveling 10 m.p.h. below posted speed limit in passing lane, failed to yield to vehicles behind him; no reasonable suspicion to stop defendant for impeding traffic); *Richardson v. State*, 39 S.W.3d 634, 638–39 (Tex. App. 2000) (defendant traveling 20 m.p.h. below speed limit; no reasonable suspicion that defendant was impeding traffic); *Salter v. N.D. Dep't of Transp.*, 505 N.W.2d 111, 114 (N.D. 1993) (defendant driving 30-35 m.p.h. in 50 m.p.h. no-passing zone of unstated length; no reasonable suspicion that defendant was impeding traffic); *People v. Brand*, 390 N.E.2d 65, 67–68 (Ill. App. Ct. 1979) (defendant traveling at 20 m.p.h. in 45 m.p.h. zone on suburban road; no reasonable suspicion that defendant was blocking or impeding traffic); *People v. Parisi*, 222 N.W.2d 757, 759 (Mich. 1974) (defendant traveling 25 m.p.h. in 35 m.p.h. and 45 m.p.h. zones; no interference with traffic so no justification for stop); *cf. Com. v. Robbins*, 657 A.2d 1003, 1004–05 (Pa. Super. Ct. 1995) (valid stop for impeding traffic when defendant traveling 17 m.p.h. in 35 m.p.h. no-passing zone and 17-20 vehicles backed up behind defendant).

Accordingly, we consider the specific circumstances of this case. The obvious candidate for the victim of Mr. Valadez-Valadez's allegedly impeding traffic would be Pepper himself. After all, he had driven behind Mr. Valadez-

-9-

Valadez for several miles before another vehicle pulled up behind him and then had driven several more miles before stopping the pickup. But Pepper never asserted that he could not have passed Mr. Valadez-Valadez during this lengthy stretch, nor did he provide information showing that he could not have. On the contrary, he testified that oncoming traffic was light—all he could say was that he encountered at least three vehicles while following Mr. Valadez-Valadez. And even though there were "multiple blind curves" along the highway, R. Vol. III at 10, he did not say that it lacked intervals where passing would have been proper, making it unnecessary for Mr. Valadez-Valadez to pull over. Indeed, Pepper testified that passing was permitted at the very location where he stopped Mr. Valadez-Valadez and that his concern was that the road about a mile ahead becomes a mountain pass where "there are not a whole lot of passing zones for a good distance." *Id.* at 33. This testimony, rather than implying that there had been few passing zones on the road as he had been following Mr. Valadez-Valadez, suggests the contrary. Moreover, Pepper's concern about the difficulty in passing on the stretch of road a mile ahead could not justify the stop of Mr. Valadez-Valadez. Mr. Valadez-Valadez may have pulled to the side of the road before the mountain pass to let others go by, or he may have driven the speed limit on the pass to avoid backing up traffic. Vehicles cannot be stopped on "reasonable suspicion" that the driver will commit a traffic infraction in the future.

Perhaps the vehicle behind Pepper was impeded in its travels. But the record does not support a finding that Mr. Valadez-Valadez was responsible. The driver of that vehicle may have lawfully been able to pass Pepper and then Mr. Valadez-Valadez. That the driver decided not to pass Pepper hardly shows that he could not have lawfully done so. It would be a brave driver who would pass a police vehicle on a road with infrequent speed-limit signs.

We are also unpersuaded by Pepper's explanation that he was concerned that a slow-moving vehicle on the highway could be rear-ended by a vehicle rounding a curve "at a high rate of speed." *Id*. at 10. Surely, the offender would not have been Mr. Valadez-Valadez but, rather, the speeding car that hit Mr. Valadez-Valadez's truck. One reason for lowering the speed limit on curves is to try to ensure that drivers can stop in time when encountering an unexpected obstacle at the far end of the curve. Even a reasonably cautious driver might nevertheless collide with an animal, a disabled vehicle, or a vehicle driving very slowly that could not be seen when entering the curve. But a vehicle going within 10 m.p.h. of the speed limit should not pose a danger. To adopt Pepper's theory of what constitutes impeding traffic would be to require all vehicles to travel at the speed limit on a winding road, whatever the volume of traffic.

We note that the government does not point to any law-enforcement manuals or other professional materials to support the stop. *Cf. United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003) (state-issued driver's manual

states that drivers must signal when exiting interstate).  The sole authority cited by the government (and by Pepper on cross-examination) in support of Pepper's interpretation of the impeding-traffic statute is the decision by the New Mexico Court of Appeals in *State v. Mann*, 712 P.2d 6 (N.M. Ct. App. 1985), which upheld a stop under the statute.  We are not bound by a lower state court's decision on a matter of state law, *see DeGasso*, 369 F.3d at 1145; *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240–41 (10th Cir. 2003); but even if *Mann* were binding, it is readily distinguishable.  The driver in that case was proceeding 20 m.p.h. below the speed limit in the passing lane.

Viewing the totality of the circumstances, we conclude that Officer Pepper did not have reasonable suspicion to stop Mr. Valadez-Valadez for violating N.M. Stat. Ann. § 66-7-305(A).  Therefore, the evidence seized through the stop and subsequent detention should have been suppressed.

## III.   CONCLUSION

We REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.