FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MIGUEL MUNOZ,

    Defendant - Appellant.

No. 24-1418

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CR-00371-JLK-1)**
_____

Robert S. Jackson, Oklahoma City, Oklahoma, for Defendant–Appellant.

Albert C. Buchman, Assistant United States Attorney (Peter McNeilly, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff–Appellee.
_____

Before **HARTZ**, **TYMKOVICH**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Defendant–Appellant Miguel Munoz entered a conditional plea of guilty to one count of conspiracy to distribute and to possess with intent to distribute cocaine and fentanyl in violation of 21 U.S.C. § 846. On appeal, he challenges the district court's denial of his motion to suppress evidence obtained as a result of a traffic stop,

arguing both that the traffic stop was not justified at its inception and that the stop was unreasonably extended.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude the district court did not err in denying the suppression motion and therefore affirm.

## I.     BACKGROUND

At around 12:45 p.m. on October 12, 2021, Kansas Highway Patrol Troopers John Rule and Jerett Ranieri were traveling westbound on I-70 in Wabaunsee County, Kansas, with Trooper Rule driving the patrol vehicle and Trooper Ranieri sitting in the passenger seat. As the troopers were beginning to turn into the freeway median at about mile marker 339, they saw a black Jeep Grand Cherokee driving eastbound. In place of a typical license plate, the Jeep had a temporary registration tag "that was flapping or blowing up," ROA Vol. III at 64, "sticking out so you couldn't tell where it was from . . . instead of being flat against the back of the vehicle," *id.* at 20–21.

Based on the flapping of the paper registration tag, which they believed to be a violation of Kansas law, the troopers "turned out of the median . . . into the eastbound lane, and began catching up to the vehicle." *Id.* at 21. Trooper Rule testified at Mr. Munoz's suppression hearing that he did not observe the same flapping after he turned eastbound to follow the Jeep, and "by the time [they] caught up with the vehicle, [the tag] had settled back down into its normal position where it should be." *Id.* at 25. Although he had no independent recollection of this observation, Trooper Rule also testified that he wrote in his report that the Jeep had

drifted onto the right fog line (the solid white line marking the shoulder of the freeway) twice within a quarter mile while he was following it.

Trooper Rule caught up with the Jeep after a few minutes, at which time he activated his patrol vehicle's emergency overhead lights to pull the Jeep over. Activating the overhead lights caused his dashboard camera to save the previous two minutes of video footage and to keep recording until he turned the overhead lights off at the end of the stop. Because it took Trooper Rule a few minutes to catch up to the Jeep, however, the recorded video does not capture the troopers' initial viewing of the Jeep or their turn through the median; rather, the video begins while the patrol vehicle is already traveling eastbound in pursuit of the Jeep.

The Jeep pulled over in response to Trooper Rule's activation of the patrol vehicle's overhead lights. Mr. Munoz was driving the Jeep, and his wife was sitting in the passenger seat. After both vehicles had come to a stop, Trooper Rule walked up to the Jeep, and the following exchange occurred:

Trooper Rule: Hello.

Mr. Munoz: Hi, officer.

Trooper Rule: How are you?

Mr. Munoz: Good.

Trooper Rule: Good, good. Can I see your driver's license?

Mr. Munoz: We're going to a funeral.

Trooper Rule: What's that?

Mr. Munoz: We're going to a funeral.

3

Trooper Rule: You're going to a funeral? Yeah, where's that at?

Mr. Munoz: In, uh—in Kansas.

Dashcam Video at 2:41–2:53.

Mr. Munoz then passed his documents to Trooper Rule with a shaking hand. Trooper Rule perceived him to be "[e]xtremely nervous," unlike what he would expect to see in "a normal traffic stop." ROA Vol. III at 32.

Trooper Rule asked Mr. Munoz who passed away, and he replied that it was one of his wife's aunts. Trooper Rule inquired when the funeral was, and Mr. Munoz said, "Um, uh—,"and then answered that he thought it was "tomorrow" or the day after that. Dashcam Video at 3:24–3:31.

Trooper Rule testified he thought it was "extremely odd" for Mr. Munoz to immediately blurt out the information that he and his wife were going to a funeral, as in Trooper Rule's experience individuals who have been pulled over will typically first ask him why they have been stopped, rather than launching into an explanation of where they are going. ROA Vol. III at 35. Moreover, Trooper Rule has "commonly come into contact with drug smugglers who" attempt to elicit sympathy during traffic stops by claiming that "a funeral or a sick relative [is] the reason for their trip." *Id.* Mr. Munoz's immediate, unprompted attempt "to justify why he[ was] [t]here" with a sympathetic-sounding explanation therefore caused Trooper Rule to "think something isn't right here." *Id.*

Trooper Rule also found it odd that Mr. Munoz said they were going to a funeral "in Kansas," as the traffic stop occurred well within the State of Kansas. *Id.*

4

at 30. Indeed, the stop occurred around mile marker 340, meaning that an individual traveling eastbound on I-70 from Colorado would have already traveled about 340 miles through Kansas to reach this part of the freeway. In Trooper Rule's three decades of experience as a Kansas Highway Patrol officer, most people he stops will tell him "what city they're going to, not the state that they're in." *Id.* at 31. And in his experience, the failure to disclose a specific destination point can be consistent with drug trafficking.

While Trooper Rule spoke with Mr. Munoz, Trooper Ranieri left the patrol car and looked through the windows of the Jeep. He observed images of the Virgin Mary and Jesus Malverde hanging from the rearview mirror.

Both troopers returned to the patrol vehicle, where Trooper Rule contacted dispatch to run Mr. Munoz's driver's license and criminal history. Trooper Ranieri told Trooper Rule about his observation of the Jesus Malverde image. Both troopers testified at Mr. Munoz's suppression hearing that Jesus Malverde is known as a patron saint of drug smuggling and that they commonly find narcotics in vehicles containing images of Jesus Malverde.

Dispatch reported that Mr. Munoz had a valid Colorado driver's license, that the Jeep was registered to him, and that he had two prior misdemeanor arrests but no drug history. After receiving this information, Trooper Rule exited the patrol vehicle and motioned for Mr. Munoz to join him at the back of the Jeep. He then explained that the tag on the back of the Jeep was blowing upward while Mr. Munoz was driving, and he lifted the unsecured bottom end of the paper tag to demonstrate the

5

problem. Trooper Rule told Mr. Munoz that he needed to tape the tag down so he would not lose it and so it would be visible. Trooper Rule then returned Mr. Munoz's license and other documents to him. At this point in the stop, Trooper Rule perceived Mr. Munoz to still sound nervous despite having been told he would not receive a ticket.

After returning Mr. Munoz's documents to him, Trooper Rule began asking Mr. Munoz more questions about his travel plans and whether he had brought anything illegal with him. After less than a minute of additional questioning, Trooper Rule asked if he could take a look in the Jeep. Mr. Munoz said, "Sure," and opened the back hatch of the Jeep. Dashcam Video at 12:43–12:48. Within ten minutes of Mr. Munoz opening the back hatch of the Jeep for Trooper Rule, the troopers found 1,025 fentanyl tablets concealed in a dog food bag and a loaded handgun in a different bag located in the back seat of the Jeep.

The troopers arrested Mr. Munoz and his wife and transported them to a Kansas Highway Patrol stationhouse. There, Mr. Munoz agreed to a search of his phone and provided officers with his phone's passcode. While Mr. Munoz and his wife were at the stationhouse, a Kansas Highway Patrol lieutenant spoke with an Assistant United States Attorney ("AUSA"). The AUSA told the lieutenant that the Government would not pursue charges against Mr. Munoz at that time but asked the Kansas Highway Patrol to "put together an investigative packet" for possible future prosecution. ROA Vol. III at 89. Mr. Munoz and his wife were accordingly released from custody.

However, the information obtained from Mr. Munoz's phone was used over the next several months by officers investigating his drug trafficking activities. Based on the information gathered from this investigation, officers conducted a second traffic stop of the Jeep in July 2022. At this second traffic stop, an officer found a gun and suspected cocaine in Mr. Munoz's pocket, and more drugs were found in the Jeep. Mr. Munoz was subsequently indicted on several drug trafficking counts and one firearm count.

Following his indictment, Mr. Munoz filed a Motion to Suppress All Evidence and Statements, contending that all evidence against him flowed from the traffic stop on October 12, 2021, which he challenged on several grounds. Among other arguments, he contended that the stop was not justified at its inception and that the stop was unreasonably extended after Trooper Rule returned his documents. In response, the Government argued that the search was justified at its inception because the troopers had reasonable suspicion that Mr. Munoz had violated two different Kansas statutes: one requiring license plates to be "securely fastened," Kan. Stat. Ann. § 8-133(c), and the other requiring vehicles to "be driven as nearly as practicable entirely within a single lane," Kan. Stat. Ann. § 8-1522(a). As for Mr. Munoz's argument that the stop was unreasonably extended, the Government argued that the initial detention became a consensual encounter after Trooper Rule returned Mr. Munoz's documents to him, or alternatively that the troopers permissibly detained Mr. Munoz based on reasonable suspicion of drug trafficking.

The district court held a suppression hearing, at which it heard testimony from Troopers Rule and Ranieri. At the close of the hearing, the district court found that the troopers "were not impeached, and their testimony was credible." ROA Vol. III at 119. And based on their testimony, the district court concluded that the stop was valid and dismissed Mr. Munoz's Motion to Suppress.

The district court elaborated on its reasoning in a written Order Denying Defendant Michael Munoz's Motion to Suppress All Evidence and Statements. In this Order, the district court held that the traffic stop was justified at its inception because the officers had reasonable suspicion to believe that Mr. Munoz had violated both Kansas Statutes Annotated § 8-133(c) and § 8-1522(a). The district court further held that the troopers had reasonable suspicion that Mr. Munoz was engaged in drug trafficking, thus justifying the brief extension of the stop. Because it upheld the extension of the stop on this basis, the district court did not consider the Government's alternative argument that "the encounter became consensual once Trooper Rule returned Mr. Munoz's documents to him." ROA Vol. I at 61.

After the district court denied his Motion to Suppress, Mr. Munoz entered a conditional plea of guilty to Count One of the indictment, which alleged a drug trafficking conspiracy in violation of 21 U.S.C. § 846. In exchange for his plea of guilty, the Government agreed to dismiss the other counts against him. Mr. Munoz's plea agreement reserved his right to appeal the district court's denial of his Motion to Suppress but waived his other appeal rights.

The district court accepted Mr. Munoz's guilty plea and ultimately sentenced him to 60 months of imprisonment. This timely appeal followed.

## II.    DISCUSSION

On appeal, Mr. Munoz argues that the district court should have suppressed all evidence obtained as a result of the October 2021 traffic stop for two reasons: (1) the traffic stop was not justified at its inception, and (2) the troopers were not justified in extending the stop after Trooper Rule handed Mr. Munoz's documents back to him. We address each argument in turn.

### A.    *Justification for the Traffic Stop*

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (quotation marks omitted). In reviewing factual findings for clear error, "[w]e will not reweigh the evidence presented to the district court, second guess the district court's credibility assessments, or question reasonable inferences the district court drew from the evidence." *United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) (quotation marks omitted).

"When, as here, the meaning of a state traffic law is at issue," we review the district court's interpretation of the state law de novo. *United States v. Valadez-Valadez*, 525 F.3d 987, 991 (10th Cir. 2008). However, we defer to the state supreme court's interpretation of state law, as "[i]t is axiomatic that state courts are the final

arbiters of state law." *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004); *see also Kaufman v. Higgs*, 697 F.3d 1297, 1300–01 (10th Cir. 2012) (holding that when police officers justify an arrest based on a state criminal statute, "the precise scope of [the defendant's Fourth Amendment] right uniquely depends on the contours of a state's substantive criminal law," which the state supreme court is "the ultimate authority" in interpreting). "If the state supreme court has not interpreted a provision of the state's statutory code, the federal court 'must predict how the court would interpret the code in light of state appellate court opinions, decisions from other jurisdictions, statutes, and treatises.'" *DeGasso*, 369 F.3d at 1145 (quoting *United States v. Colin*, 314 F.3d 439, 443 (9th Cir. 2002) (brackets omitted)).

"A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (quotation marks and brackets omitted). "The government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). Ultimately, "[t]he dispositive inquiry is whether state law provided the officer with an objectively justifiable basis for the stop." *Valadez-Valadez*, 525 F.3d at 991–92 (internal quotation marks and brackets omitted).

Here, the district court concluded that the troopers observed a violation of Kansas Statutes Annotated § 8-133(c) when they saw Mr. Munoz's paper tag flapping as he drove down the freeway. Section 8-133(c) provides:

> Every license plate shall at all times be securely fastened to the vehicle to which it is assigned, to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate. The license plate shall be fastened in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible.

Kan. Stat. Ann. § 8-133(c). As we have previously noted, this statute's "reference to '[e]very license plate' apparently includes temporary registration permits." *United States v. Edgerton*, 438 F.3d 1043, 1046 n.2 (10th Cir. 2006) (quoting Kan. Stat. Ann. § 8-133(c)).

The Kansas Supreme Court recently published an opinion interpreting § 8-133(c). *See State v. Yeargin-Charles*, 577 P.3d 542 (Kan. 2025). Specifically, the Kansas Supreme Court considered as a matter of first impression "[w]hether the failure to securely fasten a license plate to a vehicle constitutes a violation of [§] 8-133(c) where visibility and legibility are not in question." *Id.* at 547. As a matter of statutory interpretation, the court concluded that "a strict reading of the statute's plain language imposes four requirements for the display of license plates: (1) the license plate must be securely fastened to the vehicle, (2) the license plate must be positioned at least 12 inches from the ground, (3) the license plate must be clearly visible, and (4) the license plate must be clearly legible." *Id.* at 548. The court

11

then concluded that "non-compliance with any of these requirements may provide reasonable suspicion for law enforcement to initiate a traffic stop." *Id.* at 549.

While the court acknowledged that "the primary objective of [§] 8-133(c)'s requirements is presumably to ensure license plates can be easily read to identify vehicles," the court held that the plain language of the statute requires license plates "to be 'securely fastened' to vehicles, regardless of their visibility or legibility." *Id.* at 548. Accordingly, applying this interpretation to the facts of the case before it, the Kansas Supreme Court held that a deputy's observation of a "car's license plate hanging askew and 'flapping in the wind[]'" was enough in itself to give rise to "reasonable suspicion of a violation of [§] 8-133(c)'s provision requiring a vehicle's license plate to be 'securely fastened.'" *Id.* at 549.

Mr. Munoz argues on appeal that § 8-133(c) is not violated if a license plate can be read by an officer following the vehicle at a safe distance. He therefore maintains that because the troopers could read his temporary tag as they were following him, they lacked reasonable suspicion that he was violating this statute. Mr. Munoz also argues that this statute requires only that the license plate be fastened securely enough to prevent it from swinging, and he contends that the dashcam video shows that the temporary tag met this standard. Relatedly, he argues that the district court clearly erred in finding that the temporary paper tag was flapping because the dashcam footage contradicts this finding.

As an initial matter, we hold that the district court did not clearly err in finding that the temporary paper tag was flapping. *See Mayville*, 955 F.3d at 829. Both

troopers testified that they saw the temporary tag flapping and blowing upward when they first saw the Jeep, and Trooper Rule explained that the tag had "settled back down into its normal position" by the time they caught up to the Jeep. ROA Vol. III at 25. The dashcam video, which does not capture the troopers' initial view of the Jeep, does not contradict this testimony. And while the video neither proves nor disproves the troopers' testimony that the tag was flapping when they first saw the Jeep, it does corroborate the troopers' testimony that the tag was fastened in a way that would flap upward. Indeed, footage from the traffic stop shows Trooper Rule physically demonstrating to Mr. Munoz that the tag was not secured at the bottom by lifting it up and showing him the flapping motion it was making while he drove. Moreover, the district court specifically found the troopers' testimony to be credible—an assessment we will not "second guess" on appeal. *Campbell*, 603 F.3d at 1228. We accordingly accept the district court's factual finding that the troopers observed the temporary tag flapping and blowing upward. *See Mayville*, 955 F.3d at 829.

Applying the Kansas Supreme Court's interpretation of § 8-133(c) to the facts found by the district court, we hold that a reasonable officer in the troopers' position would have had reasonable suspicion that Mr. Munoz violated this statute. In *Yeargin-Charles*, the Kansas Supreme Court squarely considered and rejected the argument that § 8-133(c) is violated only if a license plate is not visible or legible, which is the primary argument Mr. Munoz makes on appeal. *See* 577 P.3d at 548. Likewise, although Mr. Munoz contends that the statute requires only that a license

13

plate be fastened well enough to prevent "swinging," the Kansas Supreme Court rejected a similar statutory interpretation of § 8-133(c) in *Yeargin-Charles*. The court there held that this interpretation "focuses too narrowly on the statutory phrase 'to prevent the plate from swinging,' while overlooking the broader statutory requirement that the plate be 'securely fastened.'" *Id.* The state court accordingly held that an officer had reasonable suspicion of a violation of § 8-133(c) based on testimony "that the license plate was 'loosely secured by a bolt or a screw on the left side in the manufacturer's hole and was tilted downwards to the right,' that it was 'not secured by anything' on the opposite end, and that the plate was visibly 'moving' and 'flapping in the wind.'" *Id.* at 547. The facts here are similar, as Trooper Rule's demonstration of the flapping paper tag showed that it was not secured by anything on its bottom end, and the troopers' uncontroverted testimony established that the tag was visibly moving and flapping in the wind.

Although *Yeargin-Charles* was published after the traffic stop at issue in this case, its interpretation of the plain language of § 8-133(c) is sufficient to establish that the troopers here had "an objectively justifiable basis for the stop." *Valadez-Valadez*, 525 F.3d at 991–92 (internal quotation marks and brackets omitted). We therefore hold that the traffic stop was valid based on the troopers' reasonable suspicion that the temporary tag on Mr. Munoz's Jeep violated § 8-133(c) because it was not securely fastened.

Because we uphold the traffic stop on this basis, we do not consider the Government's alternative argument that the traffic stop was independently justified

14

based on the troopers' suspicion that Mr. Munoz violated Kansas Statutes Annotated § 8-1522(a).

### B.     Extension of the Traffic Stop

"Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009). "Continued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a reasonable suspicion that the detained person is engaged in criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (internal quotation marks omitted).

"The Supreme Court has defined 'reasonable suspicion' as a 'particularized and objective basis for suspecting' criminal conduct under a totality of the circumstances." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This totality of the circumstances "approach precludes a divide-and-conquer analysis, where the court views each factor that would support reasonable suspicion in isolation." *United States v. Latorre*, 893 F.3d 744, 751 (10th Cir. 2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

"Although the government bears the burden of proving the reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard." *Pettit*, 785 F.3d at 1379 (quotation marks omitted). The reasonable suspicion standard "requires considerably less than a preponderance of the evidence and obviously less than probable cause." *Id.* (internal quotation marks omitted). It

15

does not require an officer to "rule out the possibility of innocent conduct," nor does it require an officer to "have evidence suggesting a fair probability of criminal activity." *Id.* (internal quotation marks omitted). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Id.* (internal quotation marks omitted) (emphasis in original).

"In this analysis, the officer's subjective motives are irrelevant. Instead, we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Latorre*, 893 F.3d at 751 (internal quotation marks and citation omitted). And again, in reviewing the denial of a suppression motion, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *Mayville*, 955 F.3d at 829 (quotation marks omitted).

Here, the district court concluded that the troopers were justified in briefly extending the traffic stop because they "had a particularized and objective basis for suspecting criminal conduct" based on "Mr. Munoz's physical nervousness, unprompted statement that he was going to a funeral, and unspecified travel plans, in addition to the image of Jesus Malverde in the Jeep." ROA Vol. I at 64. Mr. Munoz objects to the district court's evaluation of these factors. However, we see no error in the district court's factual findings, and we agree with the district court that these

facts, considered under the totality of the circumstances, created reasonable suspicion of criminal activity.

First, as to Mr. Munoz's argument that his nervousness could not support reasonable suspicion, the district court found that "[o]ut-of-the-ordinary signs and specific indicia of nervousness are present here" based on Mr. Munoz's unusual, unprompted explanation that he was traveling to a funeral, Trooper Rule's testimony that Mr. Munoz's hands were shaking, and Trooper Rule's testimony that Mr. Munoz's voice sounded very nervous even after Trooper Rule informed him that he would not receive a ticket. *Id.* at 62. Although Mr. Munoz argues that it is not strange for an individual to volunteer information about his travel plans in anticipation of being asked, the dashcam video supports the district court's finding that Mr. Munoz's initial exchange with Trooper Rule was unusual and suggestive of extreme nervousness. Mr. Munoz did not simply make a casual reference to his travel plans in the course of a conversation with Trooper Rule; rather, in response to Trooper Rule's initial request to see his driver's license, he quickly blurted out, "We're going to a funeral." Dashcam Video at 2:41–2:48.

While there may have been a "plausible innocent explanation" for this immediate unprompted comment about his travel plans, "the existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion." *Pettit*, 785 F.3d at 1381. And Mr. Munoz "does not persuasively argue that it would be objectively unreasonable to infer," *id.*, that his unprompted explanation of his travel plans immediately after being pulled over was based on unusual nervousness

stemming from his criminal activities. Moreover, the district court's factual finding of unusual nervousness was also supported by Trooper Rule's testimony that Mr. Munoz's hands were shaking as he handed over his registration and other documents, which Mr. Munoz does not contest. *See Simpson*, 609 F.3d at 1148 (holding that uncontrollable shaking can support a finding of abnormal nervousness); *United States v. Davis*, 636 F.3d 1281, 1292 (10th Cir. 2011) (determining that a defendant displayed abnormal nervousness based in part on a trooper's testimony that "he was just shaking so bad").

Our review of the appellate record, particularly the dashcam video, persuades us that the district court did not clearly err in finding that Mr. Munoz demonstrated specific indicia of abnormal nervousness. And based on this finding, "the district court properly considered [Mr. Munoz's] demeanor alongside other relevant factors in finding the trooper[s] had reasonable suspicion to extend the traffic stop." *Pettit*, 785 F.3d at 1381.

For his second argument, Mr. Munoz contends that his description of his travel plans cannot contribute to a finding of reasonable suspicion because it was not implausible for him to be traveling to Kansas for a funeral, and only implausible travel plans can give rise to a finding of reasonable suspicion. However, while implausibility can indeed support a finding of reasonable suspicion, so too can "inconsistencies, internal contradictions, or vagueness" in individuals' descriptions of their travel plans. *United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017); *see*

18

*also Simpson*, 609 F.3d at 1150 ("[This] court has found vague, inconsistent or evasive answers with respect to travel plans supportive of reasonable suspicion.").

Here, Mr. Munoz gave the vague, hesitant answer of "In, uh—in Kansas" when asked where the funeral would occur, even though he was in Kansas (and had already driven more than 300 miles into Kansas from the Colorado border) when he provided this answer. Dashcam Video at 2:52–2:54. Moreover, when asked when the funeral would take place, he said, "Um, uh," and then conveyed that he was unsure but thought it might be "tomorrow" or the next day. *Id.* at 3:24–3:31.

A reasonable officer in the troopers' position could have viewed these answers as inexplicably vague and evasive. This would support a finding of reasonable suspicion even if there might be an innocent alternative explanation for Mr. Munoz's unusual uncertainty about either the location or the date of the funeral that he had volunteered information about attending. *See Pettit*, 785 F.3d at 1381; *see also Lopez*, 849 F.3d at 927 ("[I]nexplicable vagueness . . . in purported travel plans can be a significant factor in assessing reasonable suspicion."); *United States v. Santos*, 403 F.3d 1120, 1131 (10th Cir. 2005) (holding that a highway trooper could reasonably suspect the defendant's purported travel plans were fabricated because, among other things, he "volunteered information about his family, but was unable to supply corroborative details ordinarily known to a family member"); *United States v.*

*Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008) (unpublished)[1] ("We have found similar situations, in which the driver's particular destination was unknown or could not be pinpointed, to contribute to the reasonable suspicion of an experienced officer.").

Finally, Mr. Munoz argues that the Jesus Malverde image in his vehicle should be given little, if any, weight in the reasonable suspicion analysis. For support, he primarily relies on this court's opinion in *United States v. Medina-Copete*, 757 F.3d 1092 (10th Cir. 2014), in which we held that the district court erred in "allow[ing] a purported expert on certain religious iconography to testify that veneration of a figure known as 'Santa Muerte' was so connected with drug trafficking as to constitute evidence that the occupants of the vehicle were aware of the presence of drugs in a secret compartment." *Id.* at 1095.

As Mr. Munoz acknowledges, however, this court has held that "*Medina-Copete* is the exception not the rule." *United States v. Vann*, 776 F.3d 746, 759 (10th Cir. 2015). The unreliability of the expert's testimony in *Medina-Copete* resulted from the specific facts of that case, such as the fact that the expert in *Medina-Copete* based his testimony not only on his "law enforcement knowledge and experience, but also on his personal 'self-study' of narcotics iconography." *United States v. Martinez*, 88 F.4th 1310, 1314 (10th Cir. 2023) (internal quotation marks omitted). "Unlike

---

[1] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

expert testimony from law enforcement officers based on their experience—routinely upheld by this court—the *Medina-Copete* decision hinged on the expert's inability to establish how his personal self-study led to his conclusion, how it provided a sufficient basis, or how it was reliably applied to the facts." *Id.* at 1315 (emphasis omitted). Thus, in *Martinez* we upheld the admission of law enforcement testimony regarding Santa Muerte because this testimony, unlike the testimony about Santa Muerte in *Medina-Copete*, "was based solely on [the officer's] 22 years of law-enforcement experience, . . . not personal self-study." *Id.* at 1314; *see also Vann*, 776 F.3d at 759 ("*Medina-Copete* is the exception not the rule, and, as noted, we have consistently allowed police officers to testify as to conclusions deriving from their expertise and experience."); *Arvizu*, 534 U.S. at 273 (explaining that the totality of the circumstances evaluation of reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (quoting *Cortez*, 499 U.S. at 418)).

In this case, Trooper Ranieri testified that he had attended "several training classes over the years" about the association between Jesus Malverde and drug trafficking. ROA Vol. III at 67. Moreover, both troopers testified that, in their law enforcement experience, narcotics are commonly found in vehicles that display images of Jesus Malverde. Mr. Munoz introduced no evidence to challenge this testimony, and we are not persuaded that the district court clearly erred in finding it credible. We agree with the district court that this uncontroverted testimony is

entitled to weight in determining whether the troopers had "a particularized and objective basis for suspecting" that Mr. Munoz might "be involved in criminal activity." *Pettit*, 785 F.3d at 1379–80 (quotation marks omitted); *see also Arvizu*, 534 U.S. at 273.

Based on the facts identified by the district court, which we view in the light most favorable to the Government and consider as a whole under the totality of the circumstances, we hold that the troopers had "a particularized and objective basis for suspecting" criminal activity, *Pettit*, 785 F.3d at 1379–80 (quotation marks omitted), justifying their brief extension of the stop to ask Mr. Munoz a few additional questions and seek his consent to a search of his vehicle.

## II.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Mr. Munoz's suppression motion. The conviction and sentence are therefore AFFIRMED.